**In re THE BIBLE SPEAKS, Debtor.**

**Bankruptcy No. 86–40392JFQ.**

United States Bankruptcy Court, D. Massachusetts.

May 19, 1987.

See also, Bkrtcy., 69 B.R. 643.

---

**11.** As a result of this finding, I need not decide if the Statute of Frauds is applicable in this case.

Gordon Walker, McDermott, Will & Emery, Boston, Mass., for Elizabeth Dovydenas.

Charles Morse, Co-Counsel, Worcester & Sullivan, Boston, Mass., Norman Grutman, Grutman Miller Greenspoon Hendler & Levin, New York City, for debtor/The Bible Speaks.

## OPINION ALLOWING CLAIM OF ELIZABETH DOVYDENAS

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Elizabeth Dayton Dovydenas (the "Claimant") seeks the return of several large contributions made to The Bible Speaks (the "Church"). The Church is a debtor in this Chapter 11 proceeding primarily because of this claim, having prevailed in its opposition to the Claimant's motion to dismiss the proceeding. *See In re The Bible Speaks*, 65 B.R. 415 (Bankr.D. Mass.1986). The Court has conducted a three week trial of the claim, after extensive discovery proceedings by both parties that produced much acrimony. By separate judgment, the Court has today allowed the claim in the sum of $6,581,356.25. This is a case of undue influence exerted upon a church donor which appears to be unsurpassed in our jurisprudence in its variations and in the sums involved. Revealed is an astonishing saga of clerical deceit, avarice, and subjugation on the part of the Church's founder, Carl H. Stevens. He has abused the trust of the Claimant as well as the trust of many good and devout members of the Church. This is also, apparently, one of the few restitution cases brought by a church donor where First Amendment issues have been fully briefed and argued by the parties. We set forth here findings of fact and conclusions of law in support of the judgment allowing the claim.

## I. PRINCIPAL SUBSIDIARY FINDINGS OF FACT

### A. *The Parties*

The Church is an evangelical, Bible-believing fundamentalist Christian church. It enjoys corporate tax exempt status as a religious and educational organization. It has about 1,200 parishioners and supports missionary work in numerous foreign countries. The Church operates The Stevens School of the Bible, which enrolls some 600 adults, many of whom board at the school, and a private day school for children in kindergarten through the twelfth grade, which enrolls about 300 students. It conducts a daily radio program in the form of an hour-long "talk show" concerning religious education, which is broadcast throughout the country. The Church has a cooperative relationship with a number of autonomous religious organizations located in this and other countries, called "affiliated ministries," which also use the name "The Bible Speaks." The Church owns extensive real estate in Lenox, Massachusetts, which was formerly occupied by a college preparatory school for boys. The Church moved its principal operations to Lenox from South Berwick, Maine in 1976.

Carl H. Stevens ("Stevens"), age 57, founded the Church in 1973. He is its Pastor and President, and at all material

times has been its chief executive and chief operating officer. Stevens is articulate and mild in manner, but he can at times fulminate from the pulpit in the style of a Cotton Mather. He has a commanding presence in private. Although Stevens has basically no formal education, he has taken courses at Moody Bible Institute. He holds an honorary degree from Clarksville Theological Seminary, for which the Church paid a "processing" fee.

The Claimant, age 34, is an intelligent college graduate who has taken post-graduate courses in art. She is an attentive mother, and a trusting and dependent person. She is in excellent health and enjoys many of the simple aspects of life, such as camping, horses and dogs. She has continued her interest in art. The Claimant is a descendent of the founders of the Dayton Department Stores, now operated by Dayton-Hudson Corporation ("Dayton-Hudson"). She grew up in a suburb of Minneapolis, and came into substantial wealth at an early age. Prior to her involvement with the Church, her net worth was approximately $19 million. In 1978, she married Jonas Dovydenas ("Jonas"), who was then working as a free lance photographer in Chicago. He is some 14 years older than the Claimant, and is a very capable individual.

The Claimant and Jonas began their married life in Chicago. After the birth of their first child, they desired a country setting to raise their family. In 1981, they moved to Lenox, Massachusetts, a cultural town in the picturesque Berkshire Mountains. Neither Jonas nor the Claimant had any previous close association with that area. They were very much in love and happy in all aspects of their married life. They were particularly relaxed concerning their respective roles in family finances. The income from the Claimant's investments was of course more than enough to support them. They had agreed early in their marriage that it made no sense for Jonas to attempt to earn enough for their joint support. In Lenox, Jonas continued his activities as a free lance photographer, although these became less extensive be-

cause of his involvement in various projects improving their substantial property there.

## B. *Beginning of Claimant's Relationship With the Church and Stevens*

The Claimant was raised in a Presbyterian family, and Jonas in a Catholic family, but neither attended these churches regularly as adults. After moving to Lenox, they attended a few different churches before settling on the Church in 1982. The Claimant was attracted to the Church by the large and enthusiastic crowds at its services, as well as by the relative youth of its parishioners. After attending several services, they left a $600 check in the basket. This generosity precipitated a travail for their marriage.

Shortly thereafter, two ministers of the Church appeared, uninvited, at the Claimant's home. They asked whether Stevens could visit the Claimant, and she consented. Stevens's secretary called, and the Claimant invited him to tea. Stevens was then a widower; he came accompanied by Barbara Baum ("Baum"), whom he was dating and whom he married in 1984. During that first visit he asked the Claimant and Jonas, separately, if they had accepted Jesus Christ. Each replied in the negative. The Claimant was embarassed by the question. Baum, who is the Claimant's age, expressed her desire during that visit to get to know the Claimant better.

Baum and the Claimant soon became good friends, and the Claimant began spending more time in the activities of the Church. Sometime later Baum introduced the Claimant to Kathleen M. Hill ("Hill"), who was also about the Claimant's age. Hill was employed as a bookkeeper by the Church and lived on the Church's property. She was close to both Stevens and Baum. Hill also became very friendly with the Claimant, and spent an increasing amount of time with her in church and social activities.

In mid–1983, the Claimant had a conversation with Baum and Stevens in Stevens's office, in which for the first time the Claimant affirmed to Stevens that she was a "born again Christian." Stevens then

asked her to pray for Jonas, who had not made this affirmation. He told the Claimant that Jonas was in the Kingdom of Darkness because he was not yet "born again" through the Church. This statement caused the Claimant grave concern, and she began to view Jonas as one controlled by the Devil. Her changing view of Jonas was the beginning of a growing estrangement between them. The Claimant thereafter increased the amount of time she spent with Stevens and in the activities of the Church. She had numerous private counseling sessions with Stevens, attended daily Bible classes and daily "rap sessions" that he conducted, and occasionally traveled to Framingham with him, where he delivered a sermon on Friday nights.

The Claimant's confidential relationship with Stevens, her psychological make-up, and his role in her marital strife will be more fully described later. It suffices to state here that she disclosed to Stevens the details of her wealth, as well as essentially all other personal matters. Stevens told her, in substance, on numerous occasions that: giving money to the Church was her primary mission on earth; all she needed to live on was $1 million, and the rest should be given to the Church; she should not be influenced by her husband, or her parents, sisters or advisors, because they have not been "born again" through the Church and are therefore controlled by the Devil; and her money gave her the power to release God's judgment in order to effect miracles. The Claimant accepted and believed all of this.

## C. The $1 Million Gift

Baum suffered from severe migraine headaches, which frequently incapacitated her. In November of 1984, shortly before Stevens and Baum were married, the Claimant told them, separately, she had received a message from God that she should give $1 million to the Church in order to cure Baum's migraine condition. Stevens and Baum were delighted, and urged her to do this. The Claimant got this notion because Stevens had convinced her that she was a special person who could release material benefits from God

through gifts to the Church. The idea first came to her in October of 1984 when Stevens said to her, while they were in a car together driving from an evening church service of an affiliate in another city, that it "seems" she had been hearing from the Holy Spirit. The Claimant's normal annual gifts to charities had been about $10,000 per year, except in 1977 when she gave $127,000 to the Minneapolis Art Center. When the Claimant informed Jonas of her intention to make the $1 million gift, he said he thought the idea of giving that amount away in one fell swoop was "crazy." He urged her to consult with the legal and financial advisors whom they and other members of the Dayton family had employed for years. She refused. Jonas then contacted Okabena Company ("Okabena"), the family's financial advisor located in Minneapolis, and asked for its advice concerning the gift.

On November 20, 1984, Okabena sent a three page memorandum to the Claimant and Jonas discussing the relative economic and tax benefits from three alternative methods of making the $1 million gift: an outright gift in 1984; a gift in installments over six years; or the creation of a charitable income trust. Okabena pointed out in the memorandum that an outright gift in 1984 was disadvantageous from a tax point of view because the Claimant would be unable to deduct the full amount from her taxable income, due to annual limitations on charitable deductions.

The Claimant did not wait for this advice before making her decision. On November 20, 1984, she sent a letter to Okabena directing it to transfer $1 million of Dayton-Hudson stock to the Church in December. When she later received the Okabena memorandum of November 20th, she did not discuss it at any length with Jonas. She did, however, show it to Stevens and asked him for his thoughts. He told her to disregard the Okabena advice because it was the work of the Devil, and to proceed with the gift. On December 14, 1984, Okabena brought about the transfer from the Claimant to the Church of 31,200 Dayton-Hudson shares at a value of $1,001,031.25. The

Claimant did this over the objection of Jonas who thought she should follow Okabena's advice.

## D. *The $5 Million Gift*

Thereafter, Stevens and Baum (who by then was Mrs. Stevens) told the Claimant that Baum's migraine condition had been cured by reason of this gift. To the contrary, Baum continued to suffer from the condition and it required her to be hospitalized in January of 1985. Stevens and Baum nevertheless deceived the Claimant into thinking that the condition had been cured, and she believed this at all material times. Their purpose was to further promote the Claimant's notion that she was a special person anointed by God to promote good through gifts of her money to the Church.

In early April of 1985, the Claimant informed Stevens that God had told her to make a $5 million gift to the Church in the following June. Stevens again expressed delight, and told her not to inform anyone of her intention, especially Jonas. She agreed to comply with this direction. For some time Stevens had harbored the ambition to become a television evangelist. He and the Claimant had discussed the possibility of the Church becoming a television ministry. The Church had long-range building plans which included conversion of a skating rink into a large new chapel, and the construction of television production facilities, as well as a swimming pool. Upon receiving news of the forthcoming $5 million gift, Stevens immediately began finalizing these plans. He also began planning to have the Church purchase a condominium for his personal use in Palm Beach, Florida.

On April 18, 1985, the Claimant and Jonas left with their two children for Sanibel Island, Florida to join the Claimant's parents and sisters in celebrating her mother's birthday. On that morning, before they left, Baum called the Claimant to inform her that Benjamin Turkia ("Turkia"), one of the Church's ministers, was imprisoned in Romania, and to ask the Claimant to pray for him. She said to the Claimant:

"They are probably pulling out his fingernails right now." In fact, Turkia had been detained by Romanian border guards for only 24 hours, and had been released on April 17th. He arrived in Budapest, Hungary on April 17th at 8:00 P.M. Budapest time, at which point his companion placed a call to a friend in Pennsylvania informing him of what had happened and requesting him to call Turkia's wife. Turkia's wife was immediately informed of the detention and release. She was then living in Lenox in the home of Edward Canino ("Canino"), an employee of the Church. On April 18th, after her phone conversation with Baum, the Claimant telephoned Okabena to inform it of her intention to give $5 million to the Church.

On April 21st, Jonas left Florida to return to Lenox and the Claimant remained there with her two children for a few days. On the evening of April 21st, the Claimant called Stevens in Lenox to inform him that she had decided to make the $5 million gift immediately rather than in June. She said she wanted to do this in order to obtain Turkia's release. Stevens replied "Good—get a jump on the Devil." Stevens encouraged her in her belief that the gift had the power to effect Turkia's release. On April 22, 1985, the Claimant wrote to Okabena from Florida and directed Okabena to transfer $5 million of Dayton-Hudson stock to the Church. Shortly after the Claimant returned from Florida, she learned that Turkia was free and had joined his wife in Lenox. She concluded that his release was brought about by her declared intention to make a gift for that purpose, and resolved to go ahead with the gift immediately. Stevens, Baum and Hill encouraged her in this thinking, and they again urged her not to tell Jonas, Turkia, or anyone else about the gift, with the exception of Okabena whose services in the transfer were necessary.

In the evening of April 27th, Stevens met with the Claimant and told her, in Hill's presence, that she should write a letter to him expressing her intentions concerning the $5 million gift; he told her a number of things to say in the letter. On April 28th, Hill dictated the letter to the Claimant

from notes Hill had taken during the prior conversation with Stevens. The Claimant wrote down all that she was told, and gave the letter to Hill. This April 28th letter contains statements that no one from the Church had asked her to make the gift or knew of her intention to make the gift, and that she had never been "pressured into giving money in any way either publicly or privately." These statements were false and served only Stevens's interests. At about the same time, Stevens suggested to the Claimant that she get a new post office box and direct Okabena to send all mail there, so that Jonas would not discover what was going on. The Claimant immediately did this. She also directed Okabena not to call her at home.

Bruce Dayton, the Claimant's uncle, was the head of Okabena. In late April, he informed Wallace Dayton, who is his brother and the Claimant's father, of the planned $5 million gift. He did this at least in part because of his concern that a subsequent sale of the stock by the Church could have an adverse effect upon its value. Wallace Dayton was not told of the previous $1 million gift, and he was not then aware of that prior gift. News of the intended $5 million gift disturbed him. He telephoned the Claimant on April 30th, and started to express his concern and his desire to come to Massachusetts to discuss the matter. She put him off and asked him to call her back later that evening. The Claimant then called Stevens and told him of her father's call. Stevens told her to lie to her father, to tell him that the gift was to be in an amount that was nowhere near $5 million. Stevens told the Claimant that Jonas must not overhear this conversation, so that it was important that Jonas be out of the house when Wallace Dayton called back. He arranged for Canino to invite Jonas out for dinner that evening, and Jonas accepted the invitation. When Wallace Dayton called back, the Claimant did as she was told, deceiving her father of her intentions. In his words, "she disarmed me." In that conversation, and in another the next day, the Claimant declined to see her father. He let the matter drop at that point; he learned of neither the $1 million

gift nor the $5 million gift until the following November.

Okabena, in the meantime, had forwarded the Claimant a stock power which the Claimant signed on May 1st and returned to Okabena. On May 9th, Okabena sent to a transfer agent the executed stock power with stock certificates representing 125,400 shares of Dayton-Hudson stock having a value of $5,000,325.00, and requested the agent to transfer the stock to the Church, which was done. Jonas left in early May on a photography trip to Pakistan. Before he left, he suspected that the Claimant was going to make another sizable gift to the Church, but he didn't learn of the $5 million gift until the following December.

The Church sold the stock received in this gift. These funds enabled it to convert its skating rink to a beautiful chapel, to pay off a large mortgage, to construct a swimming pool and to make a number of expenditures in furtherance of its religious and educational goals. The chapel was equipped with a closed circuit television system which permitted services to be viewed from elsewhere within the Lenox complex. The funds also enabled the Church to purchase and furnish a condominium in Palm Beach at a cost of $320,-875. This purchase was made for the personal use of Stevens and Baum. No one else has ever used the property, nor has there been any attempt to rent it. The Claimant was never informed of the intention to make this purchase or of the fact that it was made.

During the period from about April 27th to May 9th, Stevens and Hill caused the Claimant to make about six telephone calls to Okabena in order to expedite the transfer. Canino also spoke to Okabena for the same purpose. Stevens and Hill told the Claimant what to say to Okabena, and they advised her to be "aggressive." On several occasions Hill, at Stevens's direction, was on an extension line listening to the conversation. The personnel at Okabena to whom the Claimant spoke during these conversations merely accepted her directions, and did not take any position against the gift. The Claimant had no conversation

concerning the matter with her uncle, Bruce Dayton.

### E. *Termination of Relationship With Okabena*

The Claimant was angry that Okabena, through her uncle, had divulged her plans to her father. She regarded this as a breach of Okabena's obligation of confidentiality. She was encouraged in this attitude by Stevens, Baum and Hill. Stevens indicated to her that this action by Okabena was an example of the Devil seeking to frustrate God's work. She accepted this characterization of Okabena. Stevens told the Claimant that she should change financial advisors. He recommended James Freed of Dean Witter Reynolds Inc. ("Dean Witter"), whom the Church had recently employed to give it advice in the investment of its new wealth. The Claimant readily agreed to meet with Freed. Stevens informed Freed of this, giving Freed information concerning the Claimant's wealth, including her substantial holdings in Dayton-Hudson. He told Freed of the possibility of further gifts from the Claimant to the Church.

Stevens arranged a meeting in his office between the Claimant and Freed on July 9th. At that meeting, Freed, rather than first asking the Claimant what her investment goals were, began talking about the income disadvantages of Dayton-Hudson stock compared to tax free bonds. The Claimant at no time had as her investment goal the obtaining of maximum income as opposed to capital appreciation. On July 12, 1985, in a letter to Stevens with no copy to the Claimant, Freed outlined his thoughts concerning the Claimant's investments, again recommending replacement of Dayton-Hudson stock with tax free bonds. At the end of that letter he stated that the Claimant "may want to set up a trust account in which The Bible Speaks holds the investment and mails her the interest." On July 20, 1985, the Claimant opened an account with Dean Witter. She directed Okabena to cease all investment activity on her behalf and to transfer all of her assets to the control of Dean Witter. In the succeeding months, agency control over the bulk of the Claimant's assets was transferred from Okabena to Dean Witter. At the direction of Stevens, the Claimant concealed all of this from Jonas. For example, Hill and the Claimant picked September 14th to meet with Freed at his office in New Jersey because Jonas was attending a wedding on that Saturday. In October of 1985, Freed caused the sale of over $5 million of Dayton-Hudson stock. He advised the Claimant that this sale would not bring about any tax liability because of her charitable gifts. In fact, the Claimant has been assessed a substantial tax as a result of the transaction.

### F. *The 1985 Will*

In June of 1985, Stevens convinced the Claimant that she should get a new lawyer to draw a will and assist her in terminating the Okabena agency arrangement. The Claimant's attorney at that time was the one who had drawn her existing will and codicils. He was a partner in the Chicago law firm of McDermott, Will & Emory, and was experienced in estate planning. That firm also represented several of the members of the Dayton family. On July 1, 1985, Stevens brought the Claimant to meet Andrew Campoli ("Campoli"), a Pittsfield general practitioner who had very limited experience in drafting even simple wills. He was on an annual retainer from the Church. With the assistance of a few other lawyers, he was then doing all or substantially all of the Church's legal work, including both corporate matters and trials. Campoli also represented Stevens personally and a number of the Church's parishioners. He did not himself attend services at the Church.

During the next six months, the Claimant and Hill made about a dozen visits to Campoli's office to discuss the will and the termination of the agency arrangement with Okabena. Hill always accompanied the Claimant, pursuant to the directions of Stevens. Stevens had designated her as the Claimant's "covering," meaning that she was to keep him informed of the Claimant's activities. She kept Stevens fully apprised of what transpired at these sessions.

Her constant presence was never explained to Campoli, and he never objected to it. Campoli was aware at an early date that the Claimant intended to make the Church the principal beneficiary of her estate. The Claimant knew that he represented the Church on a continuing basis, but at no time did Campoli make disclosure to the Claimant of the possible effect that his representation of the Church could have upon the exercise of his independent judgment on her behalf.

The Claimant furnished Campoli with a copy of her March 31, 1981 will and two codicils thereto, one executed March 31, 1981 and another executed on December 19, 1983. These instruments contained a $2 million bequest to an existing intervivos trust for the benefit of the Claimant's children, and a few other bequests. One-half of the residue of the Claimant's estate was left to Jonas outright. The remainder went to a general charitable trust whose trustee (a sister of the Claimant) had discretion to select the charitable beneficiaries. Campoli was informed that there were intervivos trusts in existence for her children, but he did not inquire as to the value of their corpus.

Hill took an active role in all conversations concerning the will. Four of these sessions were taped at Stevens's suggestion. Hill and the Claimant told Campoli that the Claimant wanted to leave Jonas only what the law required. They informed Campoli that the Claimant's marriage was strained, but that she had no present intention of obtaining a divorce. He was also aware that the Claimant's involvement with the Church was at least a part of her marital problem. The Claimant and Hill told Campoli that the Claimant wanted to leave her children only her jewelry. This was the Claimant's desire because Stevens had convinced her of the unimportance of children having property in view of the impending second coming of Jesus Christ. She had previously made substantial annual gifts to her childrens' trusts, but had ceased this practice at Stevens's suggestion.

On December 13, 1985, the Claimant executed a new will drawn by Campoli, leaving Jonas $25,000 outright plus the right to receive income from the balance of one-third of her estate, which was to be held in trust for his benefit during his lifetime. This was the minimum amount she could leave him under Massachusetts law. The will gave only jewelry to the Claimant's children, with the explanation that "they have otherwise been generously provided for during my lifetime." The Church was left the entire residue of the estate, including the trust remainder at Jonas's death. Stevens, at Campoli's suggestion, was named the sole trustee of Jonas's trust. Hill was named executor. The will contained a direction that Stevens manage the "financial affairs" of the estate. In the event that Stevens predeceased the Claimant, this function was to be performed by seven individuals associated with the Church, including three of Stevens's children, his son-in-law, and Hill. Hill and her husband were named as alternate guardians of the Claimant's children, in the event of the prior death of Jonas. The executor was directed to have Campoli handle the estate's legal affairs. At no time did Campoli raise any issue concerning the wisdom of this entire dispositive scheme, other than to voice a mild objection to the unwieldy plan to have seven people involved in the management of the "financial affairs" of the estate if Stevens didn't survive. The dispositive scheme was dictated to him by the Claimant and Hill.

### G. Dayton Family's Discovery of the $5 Million Gift

During November 4–6, 1985, the Berkshire Eagle, the local daily newspaper, published three articles which were highly critical of the Church, based on a six month investigation by the newspaper. These articles have been taken in evidence only for the fact of their publication, and not for the truth of the statements made. Because the articles had consequences in this case, we briefly summarize their content. The Eagle cited instances of financial exploitation and manipulation of Church members. It referred to the Church's "cultist character-

istics," although conceding that its members were earnest and dedicated Christians. The articles were particularly critical of alleged extreme exaltation of Stevens in the Church, and they contained criticisms of him and the Church by a number of dissident former members, including one of Stevens's sons. The articles made no mention of the Claimant.

Jonas at this time was out of the country on another sustained photography trip. His father sent copies of the Eagle articles to Wallace Dayton, the Claimant's father, who circulated them among family members. The family was greatly disturbed, and in their discussions they learned from Okabena of the $5 million and $1 million gifts. They pleaded with the Claimant by telephone to re-examine her relationship with the Church, to no avail. Jonas returned in early December. He was informed of the $5 million gift, but he was also unsuccessful in bringing about a change in the Claimant's attitude toward the Church.

## H. *The $500,000 Gift*

Unknown to Jonas or the others, the Claimant at this time had decided to make another large gift to the Church. On December 3, 1985 she wrote a $500,000 check payable to the Church on a Dean Witter check which bore her name. She then wrote a note to Stevens telling him that she had been "led by God" to make this gift to enable the Church to have television equipment "like PTL," and inquired whether this would make television specials possible. Hill persuaded the Claimant not to deliver the note and check, and to instead make the gift anonymously. Stevens's latest ploy was to pretend that the Church would take no more gifts from the Claimant without the consent of Jonas. It was thus necessary to make the gift appear to be anonymous, and to try to insulate Stevens from it.

The Claimant therefore voided the $500,000 personal check, and delivered to Hill a Dean Witter cashier's check payable to the Church in the sum of $500,000 and dated December 12, 1985. Hill delivered this check to the Church with an anonymous, typed note directing that the funds be used for the production of television specials. This check was promptly cashed. The Church has offered testimony seeking to persuade the Court that Stevens then knew only that a substantial gift had been made anonymously. Stevens was not only cognizant of the gift from the beginning, he devised the entire charade in an attempt to hide the gift and his involvement in it. This was part of the damage control activities which he felt were necessary by reason of the Berkshire Eagle articles. The taping of the Campoli sessions was another "damage control" activity.

## I. *Other Gifts*

The Claimant made additional gifts to the Church by check in the latter part of 1985. Their dates and amounts are as follows: $14,000 in July 1985; $50,000 in September 1985; $10,000 in October 1985; and $4,000 and $2,000 in November 1985. She also gave Stevens $10,000 in cash in November 1985.

## J. *Exit Counseling and Subsequent Events*

The Dayton family decided in December that something should be done to try to have the Claimant make an objective analysis of her involvement with the Church. They were gravely concerned about what appeared to be an entire change of personality on her part. They were advised by a doctor to obtain professional exit counseling for the Claimant, and to consider a conservatorship as another step. They and Jonas accepted this advice. They retained two exit counselors, and they decided not to be forthright with the Claimant as to their plans.

The family invited the Claimant to come to Minnesota on the pretext that there was to be a celebration of her father's birthday; the Claimant went there with Jonas in January believing this ruse. The family had rented a house where the party was supposedly to take place. It was not until the Claimant arrived at that house that she was informed of the true purpose of the

gathering. She stayed in the house for about a week with Jonas, her parents, her three sisters, brothers-in-law, and the two exit counselors. She was never physically prevented from leaving. She had numerous, often emotional discussions with her family and Jonas, and spent a few hours each day with the exit counselors. The exit counselors spoke with her about psychological aspects of organizational membership. They also showed her video tapes concerning various cults, including the group involved in the Jonestown tragedy.

The Claimant was initially shocked and annoyed. She told her family that her religious views were very important to her, and they assured her that they were not concerned about her religious views. They told her they had grave concerns about what they regarded as a virtual transformation of personality on her part. After several days, the Claimant gradually came to her senses about Stevens. The turning point came when she was able to take an objective view of a conversation she and Jonas had with Stevens at the end of December. Jonas had confronted Stevens and asked him whether he had accepted any substantial gifts after the $1 million gift, not disclosing to Stevens that he then knew of the $5 million gift. Stevens put his hand on a Bible and swore that the Church had not received any additional gifts. The Claimant at the time knew he was lying, and yet she believed him. When she realized the enormity of that deviant thinking, she knew that she needed help. Toward the end of the week the Claimant signed a new will leaving her estate to Jonas and her children, and naming her father and Jonas as executors.

After about a week at the rented house in Minneapolis, the Claimant and Jonas spent a few more weeks in Iowa where she received additional exit counseling, and they then returned to Lenox. The Claimant consented to the institution of a temporary conservatorship proceeding in a Massachusetts court. Her father and a bank were appointed temporary conservators. That conservatorship expired in April of 1986. On April 14th, the Church filed a complaint in a state court seeking damages

and a declaratory judgment that the gifts were not the result of fraud or undue influence. This suit was dismissed by memorandum decision entered on June 13, 1986. The Claimant then brought suit in the same state court seeking damages and rescission based upon lack of donative intent, undue influence and fraud. The Church responded by instituting the current Chapter 11 proceeding in this Court, and it prevailed in its opposition to the Claimant's motion to dismiss this proceeding.

The foregoing sets forth many of the Court's subsidiary findings of fact. Many of the findings are based upon the testimony of the Claimant and Jonas, who were forthright and credible. Stevens, Baum and Hill gave quite a different version of the facts. Their testimony, however, was evasive and lacking in credibility. It also conflicted with much undisputed documentary evidence. Additional subsidiary findings, as well as general findings, appear in succeeding portions of this opinion. We now turn to the governing legal principles.

## II. UNDUE INFLUENCE

### A. General Principles of Law

Case law in Massachusetts on undue influence is extensive. Findings of undue influence have invalidated bequests in wills, e.g., Erb v. Lee, 13 Mass.App.Ct. 120, 430 N.E.2d 869 (1982); Hoffman v. Hoffman, 192 Mass. 416, 78 N.E. 492 (1906), codicils to wills, Reilly v. McAuliffe, 331 Mass. 144, 117 N.E. 811 (1954), and intervivos gifts. McDonald v. McNeil, 300 Mass. 350, 15 N.E.2d 460 (1938). Massachusetts courts have indicated that contracts and trusts may be voided because of undue influence. See Bruno v. Bruno, 384 Mass. 31, 422 N.E.2d 1369 (1981) (adopting test in Restatement (Second) of Contracts § 177(1) (1981) for undue influence in contracts); Marshall v. Sidney B. Pfeifer Foundation, Inc., 9 Mass.App.Ct. 412, 402 N.E.2d 76 (1980) (revoking trust based on undue influence).

■ In order to prevail on grounds of undue influence in Massachusetts, the party seeking to void the gift must demon-

858

strate that: (1) the donor was "susceptible" to undue influence to the advantage of the donee; (2) the donee deceived the donor or exerted an improper influence over the donor; and (3) the donor submitted to the "overmastering effect" of the donee's undue influence. *Miles v. Caples*, 362 Mass. 107, 112, 284 N.E.2d 231, 235 (1972); *Neill v. Brackett*, 234 Mass. 367, 370, 126 N.E. 93, 94 (1920). *Cf. Heinrich v. Silvernail*, 23 Mass.App.Ct. 218, 223, 500 N.E.2d 835, 840 (1986). Before these ultimate findings can be made, there must be a "solid foundation of established facts upon which to rest an inference of [the existence of undue influence]." *Neill v. Brackett*, 234 Mass. 367, 370, 126 N.E. 93, 94 (1920).

The Massachusetts courts recognize that much of this evidence will be circumstantial because direct evidence of undue influence is often unavailable. *See Miles v. Caples*, 362 Mass. 107, 112, 284 N.E.2d 231, 235 (1972); *Eddy v. Eddy*, 281 Mass. 156, 158, 183 N.E. 268, 268–69 (1932); *Woodbury v. Woodbury*, 141 Mass. 329, 333, 5 N.E. 275, 280 (1886). The Supreme Judicial Court of Massachusetts has stated that undue influence works in "veiled and secret ways ... [T]he power of a strong will over an irresolute character or one weakened by disease, overindulgence or age may be manifest although not shown by gross or palpable instrumentalities." *Neill v. Brackett, supra*, 234 Mass. at 369, 126 N.E. at 94. The nature of undue influence is such that it may be "exercised in indirect and underhanded ways difficult to be come at [through direct evidence]." *Hoffman v. Hoffman*, 192 Mass. 416, 419, 78 N.E. 492, 493 (1906). In making a determination of undue influence in a particular case, the court must normally consider all the circumstances surrounding a disposition, including the relationship between the parties, the physical and mental condition of the donor, the reasonableness and nature of the disposition, and the personalities of the parties. *See Neill v. Brackett, supra*, 234 Mass. at 369–70, 126 N.E. at 94. Specific undue influence cases tend to be lonely islands of facts in an ocean of law; what constitutes undue influence in one case will not necessarily constitute undue influence

in a similar case. *See Hoffman v. Hoffman, supra*, 192 Mass. at 419, 78 N.E. at 493.

The crux of the problem is of course the difficulty in determining in a particular case what degree of influence is "undue." The term "undue" necessarily implies that there are some types of influence which are "due," and courts have recognized that in all close relationships people exert an influence on each other which is natural and proper. *See Heinrich v. Silverman*, 23 Mass.App.Ct. 218, 226, 500 N.E.2d 835, 841 (1986) (Power of influence normally held by one friend over another will not automatically defeat bequest; such influence is "a simple and expected consequence of human friendship and ... compassion."); *Neill v. Brackett, supra*, 234 Mass. at 370, 78 N.E. at 94 (Persuasive and effective influences—such as a wife directing her husband's attention to "proper obligations" which he should provide for in his will—are not undue so long as they are not coercive).

The general test for "undue" influence in Massachusetts is whether, based upon all the circumstances in a particular case, a donee has exercised "unfair persuasion" against: (1) a donor whom the beneficiary dominates; or (2) a donor who, by virtue of the relationship between the donor and the donee, is justified in assuming that the donee will not act in a manner inconsistent with the donor's welfare. *Bruno v. Bruno*, 384 Mass. 31, 34, 422 N.E.2d 1369, 1371–72 (1981); *see Tarricone v. Cummings*, 340 Mass. 758, 762–63, 166 N.E.2d 737, 740–41 (1960); *Neill v. Brackett, supra; Eddy v. Eddy*, 281 Mass. 156, 160–62, 183 N.E. 268, 270 (1932); *see also Restatement (Second) of Contracts* § 171(1) (1981) (adopted in *Bruno v. Bruno*, as "substantially similar" to general law of Massachusetts on undue influence). The point at which influence becomes undue or persuasion becomes unfair is controlled by the circumstances and the characteristics of the parties in the particular case.

Any species of coercion, whether physical, mental, or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute

undue influence. Its extent or degree is inconsequential so long as it is sufficient to substitute the dominating purpose of another for the free expression of the wishes of the [donor].

*Neill v. Brackett, supra,* 234 Mass. at 369, 126 N.E. at 94.

The Claimant argues that the existence of a confidential relationship between donor and donee, coupled with the failure of the donee to encourage the donor to obtain independent advice, requires the fact finder to presume that the disposition was the product of undue influence. She relies primarily upon *Markell v. Sidney B. Pfeifer Foundation, Inc.,* 9 Mass.App.Ct. 412, 402 N.E.2d 76 (1980). The Church contends that a confidential relationship raises no such presumption under current Massachusetts law. The Church relies on a more recent Massachusetts Appeals Court decision, *Heinrich v. Silvernail,* 23 Mass. App.Ct. 218, 500 N.E.2d 835 (1986), and Massachusetts Supreme Judicial Court decisions holding that a confidential relationship only gives the court cause for "closer" or "jealous" scrutiny of the transaction. *O'Brien v. Wellesley College,* 346 Mass. 192, 190 N.E.2d 879 (1963); *Eddy v. Eddy,* 281 Mass. 156, 183 N.E. 268 (1932). The Church points also to the well-established proposition that the burden of proving undue influence is normally on the party challenging the disposition. *Miles v. Caples,* 362 Mass. 107, 112, 284 N.E.2d 231, 235 (1972); *New England Merchants National Bank of Boston v. Mahoney,* 356 Mass. 654, 657, 255 N.E.2d 592, 594 (1970); *Tarricone v. Cummings,* 340 Mass. 758, 762, 166 N.E.2d 737, 740 (1960).

This question concerning the creation of a presumption has not been resolved by the Supreme Judicial Court of Massachusetts. The Claimant is correct in that *Markell* establishes that a donee in a confidential relationship with the donor has a fiduciary duty to disclose all relevant facts to the donor known to him, and to encourage the

donor to seek meaningful independent advice about the transaction. *Markell,* 9 Mass.App.Ct. at 443–45, 402 N.E.2d at 95–96. *Heinrich v. Silvernail* may be reconcilable with *Markell* because *Heinrich* involved a bequest in a will rather than the creation of irrevocable trusts in favor of the donee. Under Massachusetts law, the requirement for proof of undue influence is greater when a will is involved. *Neill v. Brackett, supra,* 234 Mass. at 370, 126 N.E. at 94; *see Wellman v. Carter,* 286 Mass. 237, 190 N.E. 493 (1934) (Bequest in will to attorney who drafted the will is not subject to presumption of undue influence normally applied when donee is attorney of donor).

Although the Supreme Judicial Court of Massachusetts, if this case were before it, might well approve the reasoning in *Markell* and adopt a presumption of undue influence in a gift to a donee in a confidential relationship with the donor, this Court need not decide this question.[1] There is ample evidence of undue influence here, with or without artificial presumptions. The Court and the parties have tried this case without reference to presumptions, and we decide it without relying on any presumption.

## B. *Claimant's Susceptibility to Influence*

After a week or so of trial, the Court met with counsel for the purpose of exploring ways in which the length of the trial might be limited. Dr. Gersh, a psychiatrist who had examined the Claimant in Iowa, had by that time testified for the Claimant. Counsel for the Claimant had planned to introduce additional medical testimony on the issue of the Claimant's susceptibility to influence; this testimony apparently would have included some proffered expert opinion on methods used by "cults." Counsel for the Church planned to introduce evidence attacking the techniques used by the

---

**1.** A large number of states do adopt such a presumption when a parishioner gives a nontestementary gift to a clergyman or spiritual advisor, and a confidential relationship exists between the two. *See generally* 38 Am.Jur.2d, *Gifts,* §§ 93, 94 (1968 & Supp.1986); Annotation, *Undue Influence in Nontestementary Gift to Clergyman, Spiritual Advisor, or Church,* 14 A.L. R.2d 649.

Claimant's anticipated experts, whose names had been furnished to counsel pursuant to a pretrial order. The Court suggested the possibility of each side foregoing such evidence. The parties arrived at a stipulation, which was read into the record, whereby they agreed to refrain from all such evidence and they stipulated that the Claimant was a person who could be influenced, within the meaning of such decisions as *Neil v. Brackett, supra,* and *Miles v. Caples, supra.*

The Court also finds, based upon the testimony of Dr. Gersh and other evidence, that the Claimant is more susceptible to influence than the average person. The Claimant practiced transcendental meditation for a number of years prior to joining the Church. This frequently caused her to hallucinate. She depended upon her daily meditation periods, and when she did not have them she tended to be irritable. She underwent psychotherapy for about three years in Minneapolis during and after college. This involved basic Freudian psychotherapy administered three to five times per week. She "totally" depended upon her psychotherapist during this period. She left him only after becoming involved in transcendental meditation, at his suggestion based upon his own experience in its techniques.

In summary, the Claimant is a suggestible, dependent and trusting person. These qualities coexist with her high intelligence and enthusiasm in her many and varied interests.

## C. *Claimant's Confidential Relationship With Stevens*

By the Fall of 1983, the Claimant was totally immersed in the Church. Commencing then, and continuing through to the end of 1985, she saw Stevens constantly. She attended his daily Bible classes and "rap" sessions each morning. She would often drive between classes with him, and she frequently joined him for lunch. She listened to tapes of his sermons, and had frequent private counseling sessions with him. These were often unscheduled sessions which do not appear in his diary; she

had the right to see him without an appointment.

The Claimant sought and accepted advice from Stevens on every aspect of her life: spiritual, marital, family, social, personal, and financial. She disclosed all manners of confidence to him concerning such matters, including the details of her wealth. Stevens advised her on the raising of her children. He told her how to view everyone she came into contact with, with whom to make friends and whom to avoid.

The Claimant trusted, loved and revered Stevens as a pastor and as a mentor. Although their relationship remained platonic throughout, she was totally devoted to him. The thought that he would want anything that was not in her best interests never entered her mind. She believed that he loved and respected her in return. Stevens was well aware of the Claimant's total devotion to him and dependence upon him. The Claimant and Stevens therefore had a confidential relationship.

## D. *Stevens's Alienation and Deceit of Jonas and Others*

We have already set forth how Stevens caused the Claimant to begin viewing Jonas as one consigned to the Kingdom of Darkness because he had not professed to have been born again through the Church. Stevens soon had the Claimant convinced that Jonas was controlled by the Devil, and he constantly reminded her of this by piously asking her to pray for Jonas. This was done for the purpose of reducing the ability that Jonas had to influence the Claimant, so as to thereby increase Stevens's dominion over her. It was a highly successful tactic. For two and one-half years the Claimant viewed Jonas with an odd mixture of love, hate, dread and pity. She regarded his objections to the $1 million gift as having been inspired by Satan to prevent God's work. She didn't give him a chance to object to the later gifts by not informing him of them, at Stevens's direction.

Stevens did not stop there. He convinced the Claimant that Jonas should get a full-time job. Not only that, he had her believing that Jonas should be earning

enough money to support them in the style in which they were then living, a seemingly impossible goal for even the most successful free lance photographer. He said to her at one point: "Betsy, if I were your husband, I would earn so much money for you—you would be so proud of me."

This all had its intended effect. The Claimant told Jonas that he should get a job and support them. It had been their practice to maintain separate checkbooks, with Jonas paying house expenses from deposits made from the Claimant's investment income. As time went on, the Claimant objected more and more to the continuance of this practice. For the first time in their marriage, they began to bicker constantly over money. Jonas withdrew into his work, and took an increasing number of trips away from Lenox.

This is not to say that Jonas accepted any of this. It was obvious to him who was behind it, and he voiced strong objections to Stevens about what Stevens was doing. On April 16, 1985, he wrote to Stevens of the Claimant raising "questions about the way I live and my function as a husband," stating he believed that Stevens was the "catalyst" or "instrumental" in this change in her attitude toward him. He pointed out the absurdity of the Claimant telling him to get a full-time job in order to support the family while at the same time giving the Church $1 million. He asked for help from Stevens.

Stevens sent a letter in reply, full of pious platitudes and quotes from the Bible, protesting the charge that he had interfered in the marriage, and saying that he always told the Claimant to honor Jonas and had told her to give him $1 million. On May 20, 1985, Stevens added to this campaign of deceit by giving the Claimant a letter he wrote to her with the direction that she leave it in a spot where Jonas would be sure to find it, which she did. In that letter, Stevens purported to encourage the Claimant to obey and honor Jonas, and to permit Jonas to take part in all major financial decisions. This was at a time when he had just been successful in ex-

tracting $5 million from the Claimant and preventing Jonas from knowing about it.

Jonas wrote to Stevens again on October 7, 1985, saying he could no longer live with the Claimant under the terms she was dictating to him. He stated his belief that the Church was the heart of the problem, in what he considered a "perversion of faith." He again pointed out the absurdity of the Claimant requiring him to support the family, in light of the inequality of their respective incomes. He closed by saying "I pray, sir, you give her no more financial advice, even if she asks for it." Stevens replied with more platitudes. Continuing his campaign to buy Jonas off, he related how he had told the Claimant to give Jonas $1 million.

On December 3, 1985, Jonas returned from a long trip to Pakistan and Afghanistan. He wrote to Stevens on December 7th, protesting the fact that the Claimant had recently given $10,000 to the Church without his knowledge. Soon thereafter he learned from Wallace Dayton of the $5 million gift. He confronted Stevens, without telling him of this knowledge, and, as we have related, Stevens swore on a Bible that the Claimant had made no large gift to the Church after the $1 million gift the year before.

In November of 1985, after the Eagle articles came out, Stevens decided to implement his plan to buy Jonas off, and to increase the ante to $1.6 million, plus some Pennsylvania real estate, a promise of more money later, and a commitment by the Claimant to make subsequent gifts to the Church only from income rather than principal. In return, he wanted Jonas to promise not to try to influence the Claimant in her relationship with the Church.

Stevens told the Claimant to have Campoli draw up an agreement to this effect. He privately gave Hill her instructions, which included a clause whereby Jonas was to waive the right to any other property in the event of a later divorce. Hill and the Claimant then had several meetings with Campoli on the subject. Hill presented Campoli with an initial version of the agreement, which was entirely in her writ-

ing, and she worked with him on subsequent drafts. Campoli drew up the agreement almost word for word from Hill's initial draft, and on December 16, 1985 the Claimant signed it. By that time, one of the Claimant's promises in the agreement had already been broken. The agreement contained a clause wherein she promised Jonas an "incredible amount" under her will; this was in stark contradiction to the fact that three days before she had signed a will leaving him as little as the law would allow. The Claimant then presented the proposed agreement to Jonas. Not surprisingly, he refused to sign it.

Stevens's activities in alienating the Claimant from others who could influence her, and his deceit of them, have already been described. It will be recalled Stevens had filled the Claimant's head with long harranges to the effect that all those upon whom she had previously depended, including her family, her present lawyer, Okabena and anyone who sought to frustrate her gifts to the Church, were possessed by demons and were doing the work of the Devil. His command that she lie to her father about her intentions on the $5 million was justified in these diatribes as legitimate frustration of the work of the Devil.

### E. *Manner and Circumstances of Gifts*

The manner and circumstances of a gift can be significant in an inquiry concerning undue influence. *Neill v. Brackett, supra,* 234 Mass. at 369, 126 N.E. at 94. The ways in which the gifts were given here were unusual and somewhat suspicious. The claimant gave the first million dollar gift outright, despite sound advice from financial advisors suggesting methods of avoiding the tax consequences of making a gift of that size at the end of the year. The second gift of five million dollars was made with no such independent advice whatsoever. For the Claimant to make a gift of that size in one lump sum without any consideration of tax consequences or financial planning is astounding. The fact that she did so after consulting only with Stevens and nobody else, not even Jonas, is even more astounding. Finally, the "anonymous" gift of $500,000 to the Church is also somewhat unusual. She initially intended to make the gift in her own name, as she had with the other gifts. She changed the gift to an anonymous gift through Dean Witter at the request of Stevens, who wished to avoid any appearance of knowing about the gift or of its source because of recent adverse publicity. He still wanted the money, however, and was willing to accept any "anonymous" cash gifts the Claimant wished to make. In addition, despite the size of the gift, the Claimant again sought no advice as to the most advantageous way to make the gift; the manner and form of this gift were entirely to the advantage of the Church.

### F. *Influence and Dominion by Stevens in His Conduct With Claimant*

Stevens's influence over the Claimant was achieved in part by deceit and insincerity in his dealings with her. He was insincere with her when he constantly told her that she had the power to release God's judgment by bringing about miracles through her gifts to the Church, that her primary purpose in life was to give her wealth to the Church, and that Jonas and others were controlled by demons. He had no good faith belief in these statements, as we will discuss later in this opinion.

Much time was devoted at trial to the question of whether Stevens and Baum knew of Turkia's release when they spoke by telephone to the Claimant on April 18th and April 21st. The Court ruled during the trial that the Church's counsel had made a binding judicial admission, in connection with pretrial discovery, that Turkia's wife was notified by telephone of his release on the evening of April 17th. Mrs. Turkia testified that she must have misunderstood the telephone message of April 17th. But she conceded that around 6:30 P.M. Lenox time on April 18th, she had a twelve minute conversation with a minister of the Church in Vienna with whom Turkia spent that evening. Although she could not remember the details of that long conversation, she denied that she learned of his release during that conversation either.

Mrs. Turkia seems to have been confused and under a strain during that period. The Court finds, as a supplement to the judicial admission, that Mrs. Turkia knew of her husband's release no later than April 18th at 6:30 P.M. Lenox time. The Court further finds that Stevens and Baum were aware of Turkia's release when they discussed the impending $5 million gift with the Claimant over the telephone on the evening of April 21st.

Perhaps more has been made of this point than it deserves. The issue of the knowledge that Stevens and Baum had of Turkia's release is relatively insignificant when compared with their insincerity in telling the Claimant that her money had the power to bring about the release. It is this insincerity and its effect that is most relevant. It is as pernicious as their earlier insincerity in telling the Claimant that her money could cure Baum's migraine condition, and their deception of her that it did.

Implicit in all of the Claimant's dealings with Stevens, and indeed glaringly obvious, is his total dominion and control over her. This was accomplished through his express directions as well as through the various means already described. Stevens demanded the Claimant's total submission to him. He told her to concentrate on his every word. At his suggestion, she took notes while in his presence, at private as well as public sessions. She would later study these notes.

Stevens advised the Claimant to use make-up, and to be more feminine in her dress and hairstyle. Although the Claimant was already quite attractive, she complied with these suggestions, thereby significantly changing her appearance. Stevens encouraged the Claimant to regard Baum, a former model, as a paradigm in this regard.

In short, the Claimant was a marionette at the end of a number of strings manipulated by Stevens. He often used Baum and Hill as his assistant puppeteers. The result was his complete ascendancy over the Claimant. The Claimant submitted to the overmastering effect of this influence.

### G. *Conclusion of Undue Influence*

■ The Church exercised undue influence upon the Claimant, not only because of the extent of Stevens's dominion over the Claimant, but only because of the various unfair and improper means which he used in gaining ascendency over her. We here highlight only a few. An important part of his strategy was to eliminate the ability of all others to influence her. The most despicable, and perhaps the most effective, aspect of this was the elimination of Jonas' ability to influence the Claimant. In doing this, Stevens showed no regard for the sanctity of marriage. His deceit and insincerity concerning Jonas all but destroyed the Claimant's marriage. His deceit and insincerity with respect to the other members of the Claimant's family drastically changed her attitude toward them, and also eliminated them as an alternate source of advice.

Stevens's relationship of trust and confidence with the Claimant creates no presumption of undue influence. The relationship did, however, facilitate his ability to unduly influence the Claimant. Moreover, Stevens abused that relationship, in the ways already described. Among the most startling acts was the way that he dealt with the Claimant concerning her independent financial and legal advisors. Not once did he even suggest that she consult them. To the contrary, he advised her against doing this. Eventually, he succeeded in replacing them with advisors who owed their primary loyalty to him rather than the Claimant.

Stevens also unfairly, and unduly, influenced the Claimant through his insincerity in his statements to her. Particularly appalling is his insincerity in telling her that her mission from God on earth was to give money to the Church, that her money gave her the power to work miracles, and that Jonas and others were possessed by the Devil. He believed none of this, and yet he intended that the Claimant believe it and he knew that she did.

In light of the foregoing, and in light of the findings of fact contained throughout this opinion, we rule that all of the Claim-

ant's gifts were the product of undue influence exercised upon her by the Church through Stevens. *Bruno v. Bruno,* 384 Mass. 1, 422 N.E.2d 1369 (1981); *Miles v. Caples,* 362 Mass. 107, 284 N.E.2d 231 (1972); *Neill v. Brackett,* 234 Mass. 367, 126 N.E.2d 93 (1920).

### III.  FIRST AMENDMENT

The Church seeks the sanctuary of the First Amendment's command against laws prohibiting the free exercise of religion. We have previously overruled the Church's First Amendment objections to certain discovery sought by the Claimant, but at that time we reserved for later decision the possible effect that the First Amendment might have upon the merits of this claim. *See In re The Bible Speaks,* 69 B.R. 643 (Bankr.D.Mass.1987). The Church now contends that the Claimant's cause of action is barred because it cannot be resolved without the Court inquiring into "prohibited areas involving religious concepts, such as belief in miracles and demons." It apparently takes the position that this claim presents a case concerning intrachurch differences in doctrine or practices, an area in which civil courts cannot tread. The Church would also have us view the Claimant's case as a complaint that she has been duped by allegedly false religious beliefs, so that its resolution requires a determination of the validity of those beliefs. In this rather generalized fashion, it seeks to throw a cloak of First Amendment immunity around what has transpired here.

■ The Church's First Amendment arguments do not withstand any close analysis. Nor are they supported by even one of the cases which it cites. We conclude that the First Amendment does not protect the Church from this claim, for three reasons: the distinction between Stevens's statements and the Church's beliefs and practices, Stevens's insincerity, and the compelling policy grounds that support the claim. Each of these considerations, in our opinion, is sufficient to deny the Church its asserted constitutional privilege. Taken together, they are overwhelming. We shall discuss each separately.

A. *Distinction Between Stevens's Statements and Church Beliefs and Practices*

There is, of course, no question that the Church is a religion whose views are entitled to First Amendment protection. It is a Christian church which places emphasis upon the Bible. We need not, and constitutionally we cannot, go beyond this obvious observation. There is therefore no occasion here to make the type of delicate threshold inquiry that a court must make when a party claims constitutional privilege by reason of adherence to a religion which is not among the commonly recognized religions, an inquiry which no longer can concentrate on theism. *See Malnak v. Yogi,* 592 F.2d 197 (3d Cir.1979); *Theriault v. Carlson,* 495 F.2d 390 (5th Cir.1974), *cert. den.* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); *The Founding Church of Scientology v. United States,* 409 F.2d 1146 (D.C.Cir.1969), *cert. den.* 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969); *Van Schaick v. Church of Scientology of California, Inc.,* 535 F.Supp. 1125 (D.Mass. 1982); *United States v. Kuch,* 288 F.Supp. 439 (D.D.C.1968); *Holy Spirit Association for the Unification of World Christianity v. Tax Commission of City of New York,* 55 N.Y.2d 512, 450 N.Y.S.2d 292, 435 N.E.2d 662 (1982). *See also Heffron v. International Society for Khrishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); Note, *Toward a Constitutional Definition of Religion,* 91 Harv.L.Rev. 1056 (1978).

We recognize also that there can be no bright line in free exercise cases between religious belief and action, and that action in some circumstances is equally entitled to protection. *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *People v. Woody,* 61 Cal.2d 716, 394 P.2d 813, 40 Cal.Rptr. 69 (1964). That distinction, in any event, is especially blurred here where the conduct for which privilege is sought, when viewed in isolation, consists of state-

ments, rather than action in the usual sense.

The First Amendment protects only the religious beliefs and practices of the party claiming the privilege. *Wisconsin v. Yoder*, 406 U.S. 205, 230–231, 92 S.Ct. 1526, 1540–41, 32 L.Ed.2d 15 (1972). *Van Schaick v. Church of Scientology of California, Inc.*, 535 F.Supp. 1125, 1141 (D.Mass.1982). The Church's First Amendment argument flounders on this basic principle. The Claimant does not contend that she has been defrauded by false or pernicious religious beliefs or practices of the Church, or that she was unfairly manipulated into adopting the Church's beliefs or practices. The Claimant's complaint has nothing to do with the validity or reasonableness of the Church's religious beliefs or practices. She charges only that undue influence was exerted upon her which consisted, in part, of certain statements of Stevens previously referred to having reference to God and the Devil. Stevens, among his many other ploys and manipulations, told the Claimant that she could effect God's miracles through her gifts to the Church; that her primary mission on earth, by the command of God, was to give money to the Church; and that Jonas, her family and her advisors, and all of those who have not been born again through the Church, were possessed by demons so that they are the instruments of the Devil.

It is abundantly clear from the evidence offered by the Church itself that these statements do not represent Church doctrines or practices. Nor does the Church even contend otherwise. To the contrary, we have the testimony of Stevens and Pastor John Leonard, President of The Stevens School of the Bible, both of whom were examined specifically concerning the statements. Both denied that Stevens's statements represent Church doctrines, beliefs or practices. They categorically denied that the Church believed or practiced the doctrine that wealthy people such as the Claimant have as their primary mission on earth the giving of money to the Church, or that they can bring about God's miracles through gifts to the Church. They also denied the existence of any Church doctrine

that those who have not been born again through the Church are controlled by demons and are instruments of the Devil. In fact, Stevens denied making the statements at all. The statements do not, moreover, represent Stevens's personal religious beliefs.

This case is, therefore, quite different from one in which the complaint is based upon statements such as "God will reward you for giving to His Church." That statement would be perfectly consistent with Church beliefs and practices, and may, on its face, be entitled to constitutional protection. Such a statement would also, of course, lack the compelling nature of what was actually said to the Claimant.

We are not dealing here with something akin to a complaint against the Hare Krishnas for fraud in their religious practice known as Sankirtan, which consists of proselitizing through a public solicitation that includes the sale of trinkets. Sankirtan is an essential practice in the Hare Krishna religion, so that restrictions upon it raise substantial First Amendment questions. *See International Society for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441 (2d Cir.1981). Here, not only were Stevens's statements opposed to Church beliefs and practices, Stevens even asserted that they were contrary to a Church policy of soliciting funds on an individual basis rather than through general exhortation from the pulpit.

Our conclusion that a minister of a church, in speaking of God and the Devil, was not imparting the beliefs and practices of his church would in some circumstances be a determination that is frought with peril. A court should not normally, over the protests of a party, label as unreligious the statements or actions of that party. This is the clear message of *Thomas v. Review Board of Indiana*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), which involved a Jehovah's Witness who quit his job because of his convictions against war when he was transferred to a plant which manufactured tanks. He said that he did this for religious reasons, but he admitted that a fellow worker, also a Jehovah's Wit-

ness, did not have the same compunctions. When he later applied for unemployment benefits, the Supreme Court of Indiana took an objective view and concluded that he acted out of personal philosophical motives rather than for religious reasons. The Supreme Court reversed, ruling that it was not for a court to indulge in such refined analysis over the protest of one having honest religious convictions. Our case, however, is much different. Here, not only does the Church make no attempt to identify Stevens's statements as part of Church beliefs or practices, it takes the unequivocal position that they are not its beliefs or practices. We therefore engage in no conclusions contrary to stated subjective religious beliefs of a party as did the Supreme Court of Indiana in *Thomas.*

The Church places heavy reliance on *Molko v. Holy Spirit Association for the Unification of World Christianity,* 188 Cal.App.3d 49, 179 Cal.App.3d 450, 224 Cal. Rptr. 817 (1986), which is presently on appeal to the Supreme Court of California. In that case, former church members brought suit against the Unification Church, which was founded by Reverend Sun Myunng Moon in Korea. The plaintiffs sought damages for fraud, intentional infliction of emotional distress, and false imprisonment. One plaintiff also claimed restitution for $6,000 contributed to the church while he was a member. The court dismissed the count for fraud because, although the plaintiffs had initially been deceived as to the nature and identity of the church when they were first recruited, they soon learned the true facts and chose to stay on thereafter. The counts for false imprisonment and intentional infliction of emotional distress were also dismissed because there had been only "coercive persuasion" in the religious realm, such as threats of divine retribution, rather than physical restraint or threats of physical harm.

The count for restitution in *Molko,* the claim most similar to that of the Claimant here, was grounded on fraudulent inducements to join the church, as well as domination of the plaintiff through physical and psychological manipulation. The plaintiff had given $6,000 upon being told that the church was in desperate need of funds, and that "the Heavenly Father would really appreciate, and really look favorably on seeing me give the money to the church." The court found that he freely gave the money out of religious beliefs of the Unification Church which he no longer held at the time of the suit. It concluded that adjudication of his claim would necessarily involve inquiry into the reasonableness of those beliefs, an inquiry which the First Amendment forecloses. It relied upon *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), the seminal Supreme Court decision holding that the First Amendment prohibits adjudication of the truth or falsity of religious beliefs. In *Ballard,* the Supreme Court dismissed a prosecution for mail fraud against members of the "I am" movement for having made allegedly false representations concerning various religious tenets, such as the belief that the leader's movement had the power to heal incurable diseases.

*Molko* is quite distinguishable from our case. The undue influence charged there consisted primarily of allegedly unfair psychological manipulation into adoption of religious beliefs. The court regarded these beliefs as having motivated the gift. It correctly ruled that any determination of improper conduct by the church would necessarily require an assessment of the reasonableness of its religious beliefs, and that this assessment is constitutionally foreclosed. That is not our situation. We have no occasion to assess the reasonableness of the Church's doctrine and practices. We are concerned only with Stevens's statements. The Claimant does not even charge that Stevens's statements were false, so that, even with respect to his statements, this case cannot be viewed as a civil action equivalent of *Ballard.*

*Katz v. Superior Court,* 73 Cal.App.3d 952, 141 Cal.Rptr. 234 (1977), was relied upon by the court in *Molko* and is similar to it. The parents of adult children who had joined the Unification Church sought to have themselves appointed guardians of the children over their objection. The par-

ents alleged that the children, to their detriment, had changed their life style as the result of the church's coercive persuasion concerning its religion. The court recognized that it was being asked to determine the validity of the beliefs of the children. It found no compelling policy reason to do so. Citing *Ballard*, it correctly dismissed the suit.

Nor is the Church aided by any of the other cases which it cites. *Meroni v. The Holy Spirit Association for the Unification of World Christianity*, 119 A.D.2d 200, 506 N.Y.S.2d 174 (1986), is not on point. That was a suit by a father charging that the Unification Church had intentionally inflicted emotional distress upon his son, which caused the son to commit suicide. The court merely held that, under traditional tort law, the church's alleged "brainwashing" was not sufficiently extreme or outrageous conduct to be actionable. *Baumgartner v. First Church of Christ, Scientist*, 141 Ill.App.3d 898, 96 Ill.Dec. 114, 490 N.E.2d 1319 (1986), *cert. den.*, —— U.S. ——, 107 S.Ct. 317, 93 L.Ed.2d 290 (1986), was an action for the wrongful death of a former church member which was allegedly caused by the church's deviation from standard Christian Scientist care and its negligence in failing to withdraw the decedent from the Christian Scientist treatment he was receiving. The court dismissed the case, holding that the First Amendment prohibits the requested inquiry into the validity and propriety of Christian Science beliefs, citing decisions such as *Thomas*. Obviously, that case involved an asserted conflict between church beliefs and individual rights. No such conflict exists here.

The Church seeks to buttress its argument of constitutional privilege by citing decisions in *The Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Presbyterian Church of the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1960).

These decisions are wide of the mark. They deal with either doctrinal or administrative disputes within a church. In them, the Supreme Court established the wise principle that the government should not become embroiled in internecine church matters. It rejected the English common law doctrine that property contributed to a church is impressed with an implied trust in favor of the doctrines and practices of the church in effect at the time of the contribution. To the same effect is *Madsen v. Erwin*, 395 Mass. 715, 481 N.E.2d 1160 (1985), which involved the firing of an employee by the Christian Scientist Church because of the church's religious convictions against homosexuality. The court dismissed the suit as one involving hierarchical polity on matters of internal organization and faith.

Those considerations are far removed from what is before the Court here. We are not concerned with internal church division or schism (*Presbyterian Church, Kedroff*) or the propriety of the defrocking of a bishop (*Serbian Orthodox Diocese*). The present case is more like *General Council on Finance & Administration, United Methodist Council v. California Superior Court*, 439 U.S. 1369, 99 S.Ct. 35, 58 L.Ed.2d 77 (Rehnquist, Circuit Justice 1978), which involved an action against a church for breach of contract, fraud and violations of security laws. In denying the church's application for a stay, Justice Rehnquist distinguished the *Kedroff* line of cases as involving matters of ecclesiastical cognizance and polity over which civil courts should not become entangled. As in *United Methodist Council*, there is no dispute here concerning the interpretation or propriety of the Church's doctrines or practices.

The Church seeks support in the following passage from L. Tribe, *American Constitutional Law* 874–75 (1978):

Once it is conceded that first amendment values are unacceptably compromised when civil courts undertake to settle religious issues, it becomes clear that allowing a legal determination about property or some other secular matter to turn on a

court's answer to a religious question represents a path fraught with peril: the path is one along which unsatisfied former believers could drag the civil courts into the theological thicket by the simple expedient of suing for a refund of their prior donations to a religious organization.

This passage is a part of Professor Tribe's discussion of *Presbytrian Church, Kedroff* and *Serbian Orthodox Diocese.* He is speaking of a suit by an apostate or dissident who seeks a refund because of his disagreement with a church's doctrines or religious practices, such as in the *Molko* case.

In summary, our decision does not turn upon the truth or reasonableness, or even the sincerity, of the Church's doctrines or practices. The Claimant does not dispute them, nor is there any question as to what they are. The Claimant is not a Church dissident or apostate contesting Church doctrine. She does not attack Church practices in obtaining or keeping her as a parishioner. Her complaint is that Stevens's entire course of conduct constituted undue influence upon her on behalf of the Church. Included within that conduct are certain statements pertaining to God and the Devil which have been disavowed by the Church as part of its doctrine. Obviously her gifts were religiously motivated, as is true of all undue influence cases against church or clergy, but it is the exploitation of her religious motivations through unfair means that constitutes an element of her cause of action.

B. *Insincerity of Stevens in Making Statements*

We are equally persuaded, even assuming that Stevens's statements would otherwise be entitled to First Amendment protection, that the Church's claim of privilege must fail because of Stevens's insincerity. Sincerity has traditionally played an important role in the protection of rights under the free exercise of religion clause. Good faith is often a vital consideration when a court is called upon to conduct an initial threshold inquiry to determine whether the views of an organization are entitled to protection. *See Malnak v. Yogi,* 592 F.2d 197 (3rd Cir.1979); *Theriault v. Carlson,* 495 F.2d 390 (5th Cir.1974), *cert. den.* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); *The Founding Church of Scientology v. United States,* 409 F.2d 1146 (D.C. Cir.1969); *United States v. Kuch,* 288 F.Supp. 439 (D.D.C.1968). Good faith and sincerity are also relevant even though the religious nature of the organization claiming the privilege is not in question. In *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1971), the court was faced with the claim of members of the Amish Mennonite Church to an exemption from a state law requiring their children to attend public or private school. Formal high school education was claimed to be contrary to Amish beliefs because it placed their children in an environment that emphasized materialistic competition. In granting the Amish their requested exemption, the court emphasized their deep religious "conviction" concerning the matter. 406 U.S. at 216, 92 S.Ct. at 1533. *Thomas v. Review Board of Indiana,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), is to the same effect. The court there required payment of unemployment benefits to a Jehovah's Witness because he had terminated his employment by reason of his "honest conviction" that working at a weapons plant was against his religion. 450 U.S. at 716, 101 S.Ct. at 1431. *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), granted an exemption from the draft to a conscientious objector because of his sincere and meaningful beliefs opposed to war. Although this decision on its face was concerned only with interpretation of the selective service statute, it is clear from its reasoning that the court regarded its interpretation of the statute as constitutionally required.

Scrutiny of the sincerity of a religious belief "involves a somewhat truncated inquiry which must focus on extrinsic evidence." *Van Schaick, supra,* at 1145. *International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 441 (2d Cir.1981). The extrinsic evidence here is overwhelming in showing Stevens's

insincerity. His entire course of conduct is replete with hypocrisy concerning matters that do not involve religious topics. His insincerity is also indicated by his denial that he made the statements at all and his concession that they do not represent Church doctrine. The statements concerning God and the Devil were but a part of a course of manipulative conduct.

We recognize that the withdrawal of First Amendment privileges because of insincerity has its dangers. It is conceivable to imagine situations where a finding of insincerity by a court can be a disguised way of holding that religious beliefs are false or invalid. *See United States v. Ballard*, 322 U.S. 78, 92–95, 64 S.Ct. 882, 889–90, 88 L.Ed. 1148 (1944) (Jackson, J., dissenting). But those dangers are not present here for two reasons. First, there is ample evidence of Stevens's insincerity, evidence which is quite independent of the statements themselves. Second, it is undisputed that his statements do not represent Church beliefs or practices.

The decision in *Estate of Supple*, 247 Cal.App.2d 410, 55 Cal.Rptr. 542 (1966), *cert. den.* 389 U.S. 820, 88 S.Ct. 37, 19 L.Ed.2d 70 (1967), is instructive on the relevance of Stevens's insincerity. *Supple* involved a claim for undue influence of a testator brought against the Roman Catholic Church, which was the principal beneficiary under the will. It was alleged that the church had imparted various religious tenets to the testator, and that these tenets were "false." The court dismissed the claim on the authority of the *Ballard* decision, but only after declaring that insincere religious beliefs are not protected and pointing out that there had been no allegation of insincerity. The church in its answer had denied some of the alleged tenets, and the court recognized that such denials could provide grounds for finding insincerity. The court dismissed the complaint notwithstanding this because the plaintiff had previously been given ample opportunity to amend. Here the question of insincerity is fully open and the answer is obvious.

## C. Compelling Reasons Supporting Claim

There are compelling policy reasons supporting this claim which provide an independent basis for denial of a First Amendment privilege. The law is a process of constant adjustment between conflicting rights for the common good. No asserted right can at all times and in all circumstances be superior to all others. And so it is with the First Amendment, despite its exalted place in our law. For example, freedom of speech and the press are placed in the same high category as the right to the free exercise of religion, and yet rights under the law of libel and slander are preeminent.

Most of the cases concerning the free exercise clause involve attempted regulations by the state. It is well established that the state can enact reasonable regulations governing the time, place and manner of the exercise of religion. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The state may, for example, require a permit for the conduct of a religious procession on public streets, *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), or for the holding of religious services in a municipal park, *Poulos v. New Hampshire*, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). The state may also make members of the Hare Krishna religion practice their rite of Sankirtan only at an assigned booth in a state fair, rather than throughout the public fairgrounds, *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), and make Orthodox Jews close their business on Sundays, *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). A valid time, place and manner restriction must, however, serve a significant government interest. *Heffron*, 452 U.S. at 649, 101 S.Ct. at 2564.

In *Bear v. Reformed Mennonite Church*, 462 Pa. 330, 341 A.2d 105 (1975), the principle of permitting subordination of free exercise rights to significant government interests was applied to a private cause of action. The plaintiff had been

excommunicated from the Reformed Mennonite Church because of his criticism of the church's teachings and practices. In addition to excommunication, the church also ordered its members to "shun" him. Shunning was a practice of the church which involved a total boycott, whereby members were prohibited from having business or social contact with the pariah. The plaintiff alleged that this had caused his business and marriage to collapse. He claimed that not only had he lost customers and suppliers, but also his wife and children refused to have contact with him. The court overruled a demurrer to the complaint for equitable relief. It cited the Supreme Court decisions allowing state regulation to which we have referred, and held that the plaintiff had alleged excessive interference in areas of paramount state concern pertaining to the maintenance of sound marital and family relations free from the alienation efforts of others, as well as the maintenance of a business free from tortious interference.

In *Radecki v. Schuckardt*, 50 Ohio App.2d 92, 361 N.E.2d 543 (1976), several husbands brought an action for alienation of affection of their wives against a church of the Roman Catholic faith and a bishop of the church. The church and the bishop were opposed to recent changes in the international church, and taught Roman Catholicism as it had existed before the changes. The wives left the husbands and took their children from Toledo to Idaho so that they could get the desired religious education with the bishop. A jury awarded compensatory and punitive damages to the husbands. The appeals court reversed, but on the ground that there was no evidence the church intended to destroy the marriages. The court noted that a strong and compelling state interest, such as the preservation of marriage, could justify a cause of action based upon such intentional conduct despite free exercise rights. *Radecki*, 50 Ohio App.2d at 94, 361 N.E.2d at 545–46.

The interests which the Claimant seeks to protect are equally compelling. A cause of action for undue influence is grounded upon important policy considerations favoring the distribution of property in accordance with free exercise of the human will untramelled by phychological or physical coercion. Moreover, in this case, as in *Bear*, we are confronted with intentional conduct that threatened a marriage and a family, the basic social unit. Stevens's attempts to ruin the Claimant's marriage were intentional and malicious. These considerations, to our mind, far outweigh any restriction today's ruling places upon the Church's right of free exercise, even if Stevens's statements would otherwise be entitled to protection on their face. We also have in mind that his statements are but a part of other conduct that reeks of undue influence and raises no First Amendment issues.

## IV. CONCLUSION

The Church cannot, under the cloak of religion, commit wrongs upon the public. *Cantwell v. Connecticut*, 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213. The Claimant is entitled to recover all her contributions because of the Church's undue influence. We except from this ruling, however, the $10,000 cash gift which she made to Stevens personally. There has been no proof that the Church received this gift. The claim is therefore ALLOWED in the sum of $6,581,356.25. A separate judgment shall issue.