**THE BIBLE SPEAKS,**
**Debtor–Appellant,**

v.

**Elizabeth DOVYDENAS,**
**Claimant–Appellee.**

**Appeal No. 87–0124–F.**

United States District Court,
D. Massachusetts.

Jan. 25, 1988.

Charles W. Morse, Barbara D. Gilmore, Sullivan & Worcester, Boston, Mass., Norman Roy Grutman, Jewel H. Grutman, Grutman, Miller, Greenspoon, New York City, for Bible Speaks.

Gordon T. Walker, Eric R. Dannenmaier, McDermott, Will & Emery, Boston, Mass., for Dovydenas.

MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

## I. INTRODUCTION

This is an appeal from a final order of the bankruptcy court pursuant to 28 U.S.C. § 158. This Court, having reviewed the entire record, accepts and adopts in full the bankruptcy court's findings of fact in *In re The Bible Speaks*, 73 B.R. 848 (Bankr.D. Mass.1987). Only those facts necessary for understanding the discussion of law are summarized below.

## II. FACTS

Elizabeth Dayton Dovydenas ("Elizabeth Dovydenas," "claimant") is a college graduate in her mid-thirties. The Bible Speaks ("TBS," "appellant," "debtor") is an evangelical fundamentalist church formerly located in Lenox, Massachusetts. The church's pastor, president, chief executive, and chief operating officer is Carl H. Stevens ("Stevens") who founded the church in 1973.

Elizabeth Dovydenas is an heir to a substantial fortune, with a net worth of $19 million, and is married to Jonas Dovydenas.

In 1982, Elizabeth Dovydenas began attending services at TBS. She became increasingly involved in the church and became close friends with Stevens, his wife Barbara Baum Stevens, and a church employee Cathy Hill ("Hill"). *Id.* at 850.

By fall 1984, TBS and the Stevenses had become important parts of Elizabeth Dovydenas' life. The bankruptcy court found that during that time, "Stevens told her, in substance, on numerous occasions that: giving money to the church was her primary mission on earth; all she needed to live on was $1 million, and the rest should be given to the church; she should not be influenced by her husband, or her parents, sisters or advisors, because they have not been born again through the church and are therefore controlled by the Devil, and her money gave her power to release God's judgment in order to effect miracles." *Id.* at 851. The bankruptcy court also found that the claimant accepted and believed all of this. *Id.*

In November, 1984 Elizabeth Dovydenas gave her first large gift to the church. Stevens' wife Barbara suffered from severe migraine headaches and, based on what Stevens had told her about the power of her money, Elizabeth Dovydenas told Mr. and Mrs. Stevens that she heard "a message from God that she should give $1 million to the church in order to cure [Mrs. Stevens'] migraine headaches." *Id.* at 851. The Stevenses urged her to do so. Elizabeth Dovydenas then effected the transfer by contacting the family's financial advisor, Okabena Company ("Okabena"), located in Minneapolis. Okabena suggested that for tax purposes she not give the money in a lump sum. Jonas Dovydenas also counselled his wife against donating the money, but Stevens told her not to listen to her financial advisor or her husband since they were motivated by the devil. After receiving Elizabeth Dovydenas' gift, Stevens told her that his wife's migraines were cured. This reinforced Elizabeth Dovydenas' belief that, as the bankruptcy court stated, "she was a special person anointed by God to promote good through gifts of her money to the church." *Id.* at 852. Stevens hid

from Elizabeth Dovydenas the fact that his wife continued to suffer from migraines and was hospitalized for treatment in January of 1985. *Id.*

In early April 1985, Elizabeth Dovydenas told Stevens that she heard another message from God telling her to give $5 million to the church. Stevens counselled her not to tell anyone, especially her husband. Soon after their conversation, Jonas and Elizabeth Dovydenas went to Florida on vacation. Mrs. Stevens called Elizabeth Dovydenas there on April 18 to inform her that one of the church's pastors, Benjamin Turkia, was being detained by border officials in Rumania. She asked Elizabeth Dovydenas to pray for him and told her "[t]hey are probably pulling out his fingernails right now." *Id.* at 852. Actually, Turkia had been released the day before and immediately sent word to his wife who was staying with a TBS employee in Lenox, Massachusetts while her husband was gone. On April 21, five days after Turkia's release, Elizabeth Dovydenas, still believing Turkia was in captivity, called Stevens to say she wanted to donate her $5 million immediately so as to release God's power on behalf of obtaining Turkia's release. Again, according to the finding of the bankruptcy court, Elizabeth Dovydenas believed that she had the power from God to obtain Turkia's release by giving money to TBS. Stevens, who knew Turkia had already been released, told her: "Good. Get a jump on the Devil." *Id.* at 852. Elizabeth Dovydenas learned on her return that Turkia was free and she was encouraged by Stevens, Mrs. Stevens, and Hill to think that it was her pledge which freed him.

The events which followed constituted an elaborate effort on Stevens' part that no one dissuade Elizabeth Dovydenas from giving her $5 million gift. The bankruptcy court found that Stevens told her to write a letter stating her gift was voluntary and later on April 28, Hill dictated the letter to Elizabeth Dovydenas. *Id.* at 853. He told her not to tell her husband about the gift. He also told her to rent a post office box so her husband would not see the mail from Okabena, and he coached her to be aggressive in talking to Okabena. Later, after learning of his daughter's prospective gift, Dovydenas' father telephoned her to dissuade her from carrying out her plan. *Id.* Stevens told her to lie to her father and arranged for her husband to be taken out to dinner so that he would not overhear the conversation between Elizabeth Dovydenas and her father. *Id.* Finally, after the $5 million gift was executed, Stevens began a program which resulted in Elizabeth Dovydenas transferring her assets to a broker loyal to TBS, firing her lawyer, and drafting a new will with TBS' own lawyer which left substantially all her wealth to the church at the expense of her husband and children. Seven individuals associated with the church were made executors and Hill was made guardian of Elizabeth Dovydenas' children in the event Elizabeth Dovydenas' husband predeceased her. *Id.* at 854–55.

Following the $5 million gift, a number of other gifts were made in relatively small amounts. One gift was given according to a plan orchestrated by Stevens in which Stevens told Elizabeth Dovydenas to make out a cashier's check for $500,000 and then deliver it to Hill with a typed unsigned note. After that, Elizabeth Dovydenas made gifts of $14,000 in July 1985, $50,000 in September 1985, $10,000 in October 1985, and $4,000 and $2,000 in November of 1985. She also personally gave Stevens $10,000 in cash in November 1985. *Id.* at 856.

In December 1985 Elizabeth Dovydenas' family, alarmed by the changes in her personality, invited her to Minnesota. When she arrived, her family arranged for her to meet with two exit counselors who "spoke to her about the psychological aspects of organizational membership." *Id.* at 857. After a few weeks, Elizabeth Dovydenas "gradually came to her senses about Stevens." *Id.* at 857. She consented to a temporary conservatorship, made a new will leaving her estate to her husband and children, and returned to Lenox.

## III. PROCEDURAL HISTORY

TBS brought suit in Berkshire Superior Court against Elizabeth Dovydenas on

April 14, 1986 seeking a declaratory judgment that it did not owe her any debt or liability and that it did not have to return funds transferred by her. This suit was dismissed on June 13, 1986. The Massachusetts Appeals Court dismissal was affirmed on April 8, 1987.

Elizabeth Dovydenas then brought suit on June 19, 1986 in Berkshire Superior Court against TBS. She sought rescission of gifts made by her between December 1984 and December 1985 because of undue influence and fraud. After its motion to dismiss was denied on July 15, 1986, TBS sought protection of the bankruptcy court filing for Chapter 11 reorganization on July 29, 1986. Its petition, which stayed the state court action, stated that Elizabeth Dovydenas' claim against it was a core proceeding. Elizabeth Dovydenas then filed a proof of claim with the bankruptcy court on October 31, 1986. The three-week trial on the merits began on March 30, 1987 and ended on April 16, 1987. The bankruptcy court issued its final order on May 19, 1987. By assuming jurisdiction of TBS over the claimant's objection, the bankruptcy court entered into the process of administering TBS' estate while it reorganized under Chapter 11. The matter is now before this Court on appeal from the bankruptcy court's final order pursuant to 28 U.S.C. § 158.

## IV. DISCUSSION

This action is a claim by Elizabeth Dovydenas against TBS for the $6,581,356.25 which she states she gave while a victim of undue influence. Although one of the parties to this action is a church, and the other a former member of a church, the dispute is purely secular. For reasons which will be detailed below, this Court has made no inquiry into the validity of the debtor's religious doctrine. Nor is this an action by a disgruntled member of a religious sect claiming that she was induced to join a false religion. *See Molko v. Holy Spirit Association for the Unification of World Christianity,* 179 Cal.App.3d 450, 224 Cal. Rptr. 817 (1986), re-reported *Molko v. Association,* (1986, 1st Dist.) 188 Cal.App.3d 49, *review granted,* (court cannot assess rea-sonableness of church's belief in order to adjudicate claim by former members that they were manipulated to accept church's beliefs). Rather, despite appellant's attempts to make it seem otherwise, this is an ordinary undue influence action brought pursuant to a claim in bankruptcy against a debtor's estate. This Court, sitting here as an appellate court, will address sequentially the three major components of the case: the standard of review, undue influence, and the application of the first amendment. It will also review a motion for summary judgment brought by the debtor.

### A. Standard of Review

■ Appellant asks this Court for a de novo review of the law and the facts found by the bankruptcy court. This Court is obligated to conduct a de novo review of law. *Molerio v. Federal Bureau of Investigation,* 749 F.2d 815, 820 (D.C.Cir.1984). A trial court's findings of fact, however, are usually reviewed on a "clearly erroneous" standard so that they will only be set aside if the trial court was "clearly erroneous." *Id.* Bankruptcy Rules 7052 and 8013 confer upon the findings of a bankruptcy court the same standard on review as Rule 52 of the Federal Rules of Civil Procedure accords the findings of a district court on appellate review: that findings of fact must be upheld unless "clearly erroneous." Nonetheless, a claim which is identified as a non-core proceeding allows for a de novo review of the factual findings of the bankruptcy court. Appellant raises a series of arguments on appeal which, in direct contrast to its arguments before the bankruptcy court, attempt to achieve de novo review of the bankruptcy court's findings of fact by identifying Elizabeth Dovydenas' claim against TBS as a non-core proceeding.

Because this Court sits as an appellate court, it will not consider arguments raised on appeal which were not raised below. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (general rule is that a federal appellate court does not consider an issue not passed on below); *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194,

201 n. 4 (1st Cir.1987) (issues not raised at trial not properly before appellate court); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890 (1st Cir.1979). The appellant's attempt to do so here is especially inappropriate since it successfully sought jurisdiction in the bankruptcy court by arguing strenuously that Elizabeth Dovydenas' claim was a core proceeding. On August 15, 1986 TBS filed a motion entitled "Motion of Debtor Seeking an Evidentiary Hearing on All Issues Raised by Dovydenas August 11, 1986 Motions and Opposition Thereto." In it, appellant argues that the bankruptcy court should assume jurisdiction of the claim because it could provide quick and final adjudication. It argued, *inter alia,* that the proceeding was core stating that "if [Elizabeth Dovydenas] does not file a timely proof of claim, the Debtor will file a proof of such claim (§ 501(c)) for the purpose of filing an objection to such claim (§ 502(b)). The proceedings upon an objection to a claim is [sic] a 'core proceeding' pursuant to 28 U.S.C. § 157(b)(2)(B)." Motion at 2. The bankruptcy court granted TBS' motion asserting that it had jurisdiction to "quickly and simply" render a final decision. *In re the Bible Speaks,* 65 B.R. 415, 427 (Bankr.D.Mass.1986). Only after losing in the bankruptcy court is appellant attempting to change its characterization of the matter as non-core.

Even if this Court were inclined to consider arguments raised for the first time on appeal, appellant's arguments are without merit. Nevertheless, this Court will review appellant's arguments as they exhibit many serious misinterpretations of modern bankruptcy law. In short, appellant makes three arguments as to why this Court should engage in de novo review of the bankruptcy court's findings of fact: first, the matter is non-core because it considers a principle of state law; second, the matter is non-core because the bankruptcy court made findings of fact about persons other than the claimant and debtor; and third, the matter is non-core because the debtor, as a church, has a first amendment right to review by an Article III court.

### 1. The Claim is a Core Proceeding Even Though it Considers a Principle of State Law

■ As stated above, appellant cannot argue that Elizabeth Dovydenas' claim is non-core having achieved the jurisdiction of the bankruptcy court by arguing that it was a core proceeding. Not only is this argument barred by the conventions of appellate procedure, it is also incorrect. Elizabeth Dovydenas' claim against TBS is a classic claim against a debtor's estate. Indeed, hers is the major claim against the debtor's estate. As such, it is specifically listed by statute as an example of a core proceeding. 28 U.S.C. § 157(b)(2)(B).

Appellant's argument, apparently stemming from a misreading of *Northern Pipe Line Co. v. Marathon Pipeline Company,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), is that because Elizabeth Dovydenas' claim is based on the state law principle of undue influence, it is not a core matter. *Marathon* is a landmark bankruptcy case questioning the constitutionality of the broad powers granted the bankruptcy courts by the 1978 Bankruptcy Act. The Bankruptcy Reform Act of 1978, Pub. L. No. 95–598 (the "1978 Act"). Specifically, *Marathon* held that the resolution of a state law action owned by the debtor was not a core proceeding. *Marathon* did not, however, have the dramatic effect ascribed to it by the appellant.

■ This Circuit, following the lead of the Supreme Court in *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), construes *Marathon* narrowly. *See In re Arnold Print Works, Inc.,* 815 F.2d 165, 169 (1st Cir.1987). The mere fact that a claim asserts state law does not make it non-core. *Id.* The First Circuit stated that "[t]he fact that a claim in a bankruptcy matter raises issues of state, rather than federal law does not by itself determine that it is noncore, rather than core. A claim [for example] by a creditor for money owed by the debtor ... might depend entirely upon ... state law...." *Id.* at 169. Even appellant admits that Elizabeth Dovydenas' claim "arguably fits within the

literal wording of the [statutory] definition of core proceedings." Appellant's Brief at 44.

■ This Circuit has also held, specifically, that the "clearly erroneous" standard of review is constitutionally permissible after *Marathon.* In *Briden v. Foley,* 776 F.2d 379 (1st Cir.1985), the First Circuit rejected an argument that *Marathon* required the stricter de novo standard of review. The court held that "Bankruptcy Rules 7052 and 8013, which require the application of the clearly erroneous standard to a bankruptcy court's findings of fact, are constitutional as applied to core proceedings.... The Supreme Court's decision in [*Marathon* ] casts no doubt on this conclusion." *Briden,* 776 F.2d at 381. *See also In re Shop-n-Go of Maine, Inc.,* 38 B.R. 731 (Bankr.D.Maine 1984). Since Elizabeth Dovydenas' claim is a core matter and since findings of fact in core matters are by law reviewed according to the "clearly erroneous" standard, appellant's claim for de novo review is contrary to law.

2. Elizabeth Dovydenas' Claim is a Core and Not a "Related To Proceeding" even though the Bankruptcy Court Made Findings of Fact Regarding Persons Other than Claimant and Debtor

Appellant contends that because the bankruptcy court made findings of fact regarding persons other than the claimant and the debtor, it converted the claim into a "related to proceeding" which is reviewed as a non-core proceeding pursuant to 28 U.S.C. § 1334(c)(2) and is the subject of special procedures contained in 28 U.S.C. § 157(c)(1). *See* Collier on Bankruptcy, ¶ 3.01[1][c][iv–v] (15th ed. 1987). Briefly, "related to proceedings" are "those which (1) involve causes of action owned by the debtor that become property of the estate under section 541, and (2) suits between third parties which in one way or another affect the administration of the title 11 case." *Id.* at 3.01[1][c][iv]. Appellant's argument appears to be based on the bankruptcy court's finding of fact that Carl Stevens, aided by his wife and Cathy Hill, exerted undue influence on Elizabeth Dovydenas. Since these findings were about persons other than the claimant and debtor, argues appellant, they were only "related to" the action between the claimant and the debtor.

This argument defies common sense. The bankruptcy court assessed no liability against Stevens, his wife, or Cathy Hill. Nor did it award relief to any person except the claimant Elizabeth Dovydenas. In fact, the bankruptcy court specifically declined to include in Elizabeth Dovydenas' recovery a $10,000 gift which Elizabeth Dovydenas made personally to Carl Stevens. Instead, the only recovery allowed was of money given by the claimant, Elizabeth Dovydenas, to the debtor, TBS.

■ Having noted above the Supreme Court's decision in *Thomas,* and the First Circuit's interpretation in *Arnold,* which avoid construing *Marathon* as barring core proceedings based in state law, this Court sees no barrier to permitting the bankruptcy court to make findings of fact regarding a state law claim between a debtor and claimant. Since Elizabeth Dovydenas' claim of undue influence is based on the actions of Stevens, aided by his wife and Hill, in his official capacity as an officer of TBS, it was essential for the bankruptcy judge to determine how Stevens' statements to Elizabeth Dovydenas and her husband, contributed to his exercise of undue influence. *See infra* at 758–61. Thus, the bankruptcy court's findings of fact were directed at the claim between claimant Elizabeth Dovydenas and debtor TBS. This was not a "related to proceeding."

Finally, appellant's argument attempting to separate findings of fact about Stevens from findings of fact about TBS is really a claim that because the debtor is a corporation, any finding regarding the actions of humans is a "related to" rather than a core proceeding. This argument ignores the most basic principle of corporate law which is that a corporation acts through human agents. *Holmes v. Bateson,* 583 F.2d 542, 560 (1st Cir.1978). The corollary to this is that a corporation is liable for acts committed by its agents on the corporation's be-

half. *United States v. Peters*, 732 F.2d 1004, 1008 (1st Cir.1984) (citing *United States v. Hartley*, 678 F.2d 961, 970 (11th Cir.1982)). Thus, in every case where a corporation is the debtor, the bankruptcy court must make findings regarding the actions of human agents. For example, when evaluating promissory notes, the bankruptcy court must always make a finding regarding the human who signed the note. It is not disputed that Stevens was an agent of TBS. Nor can it be disputed that his acts were intended to benefit TBS by providing it with money. Indeed, the bankruptcy court in its ruling distinguished between the $10,000 gift which Elizabeth Dovydenas gave Stevens personally and the $6,581,356.25 which she gave him in his capacity as an agent for TBS by excluding the $10,000 gift from Elizabeth Dovydenas' recovery. If this Court accepted appellant's argument that any findings of fact except those concerning claimant and debtor are "related to proceedings," then it would be impossible for any action against a corporate debtor to be a core proceeding. Such is obviously not the intent of Congress and will not be adopted by this Court.

3. The *Bose* Decision is Not Applicable

The appellant's third argument for characterizing Elizabeth Dovydenas' claim as non-core is based on a misreading of the Supreme Court case, *Bose Corporation v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Appellant claims that the bankruptcy court's findings of fact which led it to conclude that TBS had exerted undue influence were based on false statements made by Elizabeth Dovydenas. Appellant cites *Bose* for the proposition that cases raising first amendment issues should be subject to de novo rather than the clearly erroneous standard of review. Thus, it concludes, this Court should review de novo the bankruptcy court's decision to find that Elizabeth Dovydenas' statements regarding the actions of Stevens, his wife, and Cathy Hill were true.

In *Bose*, a manufacturer of loud speakers sued the publisher of a consumer magazine for "product disparagement." The district court found that there was a first amendment issue at stake but held that in order to recover, the manufacturer would have to prove actual malice on behalf of the magazine. *Bose Corporation v. Consumers Union of United States, Inc.*, 508 F.Supp. 1249, 1270 (D.Mass.1981). The First Circuit, however, reversed the district court after a de novo review of the district court's conclusions of law, not its findings of fact. *Bose Corporation v. Consumers Union of United States, Inc.*, 692 F.2d 189, 195 (1st Cir.1982) ("[W]e recognize that we are in no position to reconsider the credibility of witnesses and must leave questions of demeanor to the trier of fact"). The Supreme Court then affirmed the First Circuit, writing that in libel cases requiring a finding of actual malice for recovery, as outlined in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the appellate court has a duty to make a de novo review of the trial court's legal conclusion. *Bose*, 466 U.S. at 498–501, 104 S.Ct. at 1958–60.

This narrow holding does not alter Rule 52 of the Federal Rules of Civil Procedure which calls for appellate courts to exercise the "clearly erroneous" standard when reviewing findings of fact by the trial court. *Id.* at 498–99, 104 S.Ct. at 1958–59. The Supreme Court in *Bose* specifically stated that "our standard of review must be faithful to both Rule 52(a) and the rule of independent review applied in *New York Times v. Sullivan.*" *Bose*, 466 U.S. at 499–500, 104 S.Ct. at 1958–59. Moreover, the Supreme Court minimized the effect of its holding on Rule 52 by stating that the appellate court must always review the entire record in order to make its determination whether or not the trial court's findings of fact were "clearly erroneous." *Id.* at 500, 104 S.Ct. at 1959. Finally, the Supreme Court noted:

Rule 52(a) commands that 'due regard' shall be given to the trial judge's opportunity to observe the demeanor of the witnesses; the constitutionally based rule of independent review permits this opportunity to be given its due. Indeed, as we previously observed, the Court of

Appeals in this case expressly declined to second-guess the District Judge on the credibility of the witnesses.

*Id.* at 499–500, 104 S.Ct. at 1959.

Nothing in *Bose* then warrants the appellant's claim that the facts in any case which might raise a first amendment issue must be reviewed de novo. It is the job of the bankruptcy court, as the trier of fact, to determine which of Elizabeth Dovydenas' statements were or were not to be believed. To the extent that the bankruptcy court's findings are not clearly erroneous, they must be adopted by this Court in making its review of the law.

■ Unconvinced by appellant's arguments, this Court finds that the bankruptcy court's decision in *In re The Bible Speaks* was a final decision of a core matter and thus subject to Bankruptcy Rule 8013's "clearly erroneous" standard of review. This is consistent with Fed.R.Civ.P. 52(a). The clearly erroneous standard is especially appropriate here because the court's findings rest, to a great extent, on demeanor evidence and evaluation of a witness' credibility rather than documentary evidence. The First Circuit recently held that regarding the credibility of witnesses, "no subject matter is more clearly within the exclusive province of the fact-finder." *O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067, 1076 (1st Cir.1986). The court wrote further that "questions of credibility are factual findings that must on appeal be resolved in favor of affirming the trial court's findings, unless shown to be clearly erroneous." *Id.* at 1076 (citing *United States v. United States Gypsum,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

■ Thus, after conducting a careful review of the record and of the bankruptcy court's findings, this Court concludes that the bankruptcy court's findings of fact are not clearly erroneous and must be affirmed. The facts set out in the beginning of this Memorandum and Order, then, are merely a summary and do not supplant the bankruptcy court's findings of fact. The bankruptcy court's findings of fact are based on oral testimony and documentary evidence. It found Elizabeth Dovydenas and her husband to be "forthright and credible." 73 B.R. at 857. It found the testimony of Stevens, his wife, and Hill to be "evasive and lacking in credibility [which] ... conflicted with much undisputed documentary evidence." *Id.*

Given that the bankruptcy court's findings of fact are not clearly erroneous, this Court must next conduct a de novo review of its findings of law. *In re Mazzola,* 23 B.R. 263 (Bankr.D.Mass.1981).

### B. Undue Influence

■ Elizabeth Dovydenas claims that she was under undue influence when she gave money to TBS. Facts found by the bankruptcy court support a conclusion that claimant Elizabeth Dovydenas' gift was motivated by undue influence on the part of the debtor. Federal courts must apply the substantive law of the state except in matters governed by the federal constitution or acts of Congress. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Since there is no federal law of undue influence, Massachusetts law applies. In order to succeed in a claim of undue influence in Massachusetts, the leading cases hold that the burden is on the donor to prove that 1) she was susceptible to undue influence; 2) undue influence was exerted; and 3) she submitted to the overmastering effect of such undue influence. *Miles v. Caples,* 362 Mass. 107, 284 N.E.2d 231 (1972); *Neill v. Brackett,* 234 Mass. 367, 370, 126 N.E. 93, 94 (1920). In *Bruno v. Bruno,* 384 Mass. 31, 422 N.E.2d 1369 (1981), the Supreme Judicial Court further defined undue influence as "unfair persuasion of one party under the domination of another ... [which] seriously impairs the free and competent exercise of judgment" by the donor. *Id.* 384 Mass. at 34, 422 N.E.2d 1369. After making a careful review of the record and of the law, this Court is satisfied that the bankruptcy court found facts which are legally sufficient to satisfy the three-prong test of undue influence in *Neill.*

### 1. Susceptibility to Undue Influence

The bankruptcy court found that the parties stipulated to Elizabeth Dovydenas' susceptibility to influence during an in camera proceeding before the bankruptcy judge on April 8, 1987. Transcript of In Camera Proceedings, April 8, 1987 ("Tr.") at 9. The stipulation was not objected to by either party either before the bankruptcy court or on appeal. According to the transcript made available to this Court, the bankruptcy judge read the following stipulation into the record: "The parties stipulate that Elizabeth Dovydenas was at relevant times with respect to the various gifts, donations in dispute, susceptible to influence as that concept is used in the Massachusetts cases, such as *Neill* ... and others, with respect to the threshold element of an undue influence case." Tr. at 9–11.

According to the transcript, the stipulation was intended to forestall lengthy psychiatric testimony regarding Elizabeth Dovydenas' susceptibility to influence. Appellant argues, and this Court agrees, that a stipulation that Elizabeth Dovydenas was susceptible to influence does not mean that she was, in fact, influenced. It merely establishes the first prong of a three prong test.

### 2. Exertion of Undue Influence

The second part of the test for undue influence asks whether the influence was, in fact, exerted. To satisfy this part of the test, appellee must show both that influence was exerted and that the influence exerted was undue.

#### a. *Was Influence Exerted?*

Appellant challenges the claim that Stevens influenced Elizabeth Dovydenas to give money to TBS. Appellant contends that the following facts controvert the bankruptcy court's conclusion that influence was exerted on Elizabeth Dovydenas: she initiated the gifts to TBS, decided their amounts, gave the $1 million gift before she heard Mrs. Stevens' migraines were cured, and was in Florida when she decided to give the $5 million to free Turkia. Appellant has also requested that this Court

weigh the bias of the witnesses who testified regarding influence exerted on Elizabeth Dovydenas as to the likelihood of their telling the truth. This Court, however, will only review whether the bankruptcy court's findings of fact that Elizabeth Dovydenas was the object of influence by TBS were clearly erroneous. Again, this Court will not usurp the bankruptcy court as the finder of fact by weighing the "bias" of witnesses or the likelihood of their telling the truth as appellant has requested.

Despite appellant's arguments that Stevens did not directly tell Elizabeth Dovydenas to give money to TBS, the bankruptcy court's conclusion remains that Stevens did tell her that "giving money to the church was her primary mission on earth; all she needed to live on was $1 million and the rest should be given to the church; she should not be influenced by her husband, or her parents, sisters or advisors, because they have not been born again through the church and are therefore controlled by the devil, and her money gave her the power to release God's judgment in order to effect miracles." 73 B.R. at 851. Thus, regardless of whether Stevens directly made requests for money from Elizabeth Dovydenas, the facts as found by the bankruptcy court support a conclusion that TBS did influence Elizabeth Dovydenas' decision to donate. Even if Stevens did not originate the idea that her money could change events in the outside world, he confirmed her belief that it could, even though this was not one of his religious beliefs. *See infra* 762–763. On two notable occasions Stevens reinforced Elizabeth Dovydenas' conviction that money could influence events. First, Stevens told Elizabeth Dovydenas that she cured his wife's migraines. Second, he told Elizabeth Dovydenas that she effectuated Turkia's release when he knew that her money had not done either thing. In this way, his behavior influenced Elizabeth Dovydenas' decision to give money to TBS even though he did not explicitly appeal to her for donations. For these reasons, this Court finds that Stevens exerted influence on Elizabeth Dovydenas.

### b. *Was Influence Undue?*

According to Massachusetts law, there is a presumption of undue influence when a gift is made pursuant to a confidential relationship. *Barnum v. Fay*, 320 Mass. 177, 181, 69 N.E.2d 470 (1946). A variety of relationships have the potential for control that justify a characterization of "confidential" relationships. They include relationships with the donor's attorney, guardian, spouse, friend, and psychiatrist as well as clergyman. Clark, *Gratuitous Transfers*, 249–252 (1986). While the bankruptcy court did not rely on presumptions, presence of a confidential relationship remains strong evidence of the exertion of undue influence.

Following the Restatement of Trusts, Massachusetts courts have held that a confidential relationship exists between persons when one person has confidence and trust in the other and the influence that grows out of that trust and confidence is possessed by the other. *Markell v. Sidney B. Pfeifer Foundation, Inc.*, 9 Mass.App. 412, 444, 402 N.E.2d 76, 94–96 (1980). Because of the high level of trust endowed a person who has a confidential relationship with regard to another, that person has a duty of honesty and full disclosure in business transactions. He is also "liable for concealing facts which by reason of the relationship he should disclose." *Reed v. A.E. Little Co.*, 256 Mass. 442, 449, 152 N.E. 918 (1928). The bankruptcy court found that Stevens was Elizabeth Dovydenas' spiritual advisor. It also found that their relationship was a close one and that she spent considerable amounts of time with Stevens. Moreover, the bankruptcy court found that she took Stevens' advice on many topics, such as "[m]arital, family, social, personal and financial" matters not relating to the church. 73 B.R. at 860. These facts are more than sufficient to constitute a confidential paster/parishioner relationship.

While there is no one factor which establishes undue influence, considered together, the facts found by the bankruptcy court satisfy the legal requirements. Stevens was Elizabeth Dovydenas' pastor. She was a loyal and devoted member of the church. The bankruptcy court found that Stevens told her that her money granted her special status. *Id.* at 863. If he did not inculcate, then he reinforced her beliefs that her gifts could alter events in the world such as curing Mrs. Stevens' migraine headaches. The danger of a confidential relationship is not confined, as appellant claims, to situations in which the pastor turns his parishioner into a zombie or automaton. Rather, the law recognizes the danger of undue influence in the pastor/parishioner relationship because of the trust instilled.

Another important factor in determining whether the influence is undue is an attempt by the influencer to isolate the donor from outside sources of advice. The Supreme Judicial Court of Massachusetts, in deciding a case of undue influence, noted that one of the factors in determining whether or not a friend of an elderly woman exerted undue influence was that "he discouraged her from having relations with her next of kin and told her that 'her relatives didn't care for her as much as he.'" *Mirick v. Phelps*, 297 Mass. 250, 253, 8 N.E.2d 749 (1937). This is consistent with the bankruptcy court's finding that Stevens isolated Elizabeth Dovydenas from her husband and family by telling her that they were motivated by Satan. He also advised her against consulting her independent lawyers and financial advisors. *Mirick*, 297 Mass. at 253, 8 N.E.2d 749. "Eventually, he succeeded in replacing them with advisors who owned their primary loyalty to him rather than the claimant." 73 B.R. at 854–55. These factors lead this Court to conclude appellant unduly influenced Elizabeth Dovydenas.

### 3. Did Elizabeth Dovydenas Submit to the Overmastering Effect of Undue Influence Exerted by Carl Stevens?

Having concluded that Elizabeth Dovydenas was susceptible to undue influence and that undue influence was exerted, this Court must next decide whether the facts found by the bankruptcy court support a determination that she submitted to the overmastering effect of the influence. This Court agrees with appellant that the

parties have not stipulated that Elizabeth Dovydenas' will was overcome. It cannot agree, however, with appellant's argument that the evidence of overmastering influence is flawed because of the bias of witnesses. Nor can it reject the bankruptcy court's findings because, as appellant argues, Stevens' statements to Elizabeth Dovydenas are "implausible." It is the role of the finder of fact to sift the plausible from the implausible. This Court has already determined that the bankruptcy court's findings of fact were not clearly erroneous, and now must apply them to the relevant legal standards.

According to the findings of the bankruptcy court, Stevens, with the help of his wife and Hill, convinced Elizabeth Dovydenas that her family and her lawyers were motivated by Satan to advise her against giving money to TBS. He convinced her that the more they protested, her gifts would have a greater likelihood of thwarting Satan. These actions alienated Elizabeth Dovydenas from her husband, family, and other sources of impartial advice. More persuasive than any of these matters, though, is Stevens' deliberate program of lying to Elizabeth Dovydenas about the effects of her donations on outside events as exemplified by the migraine and Turkia incidents. That Elizabeth Dovydenas was able to commit acts, such as lying to her father, which Stevens encouraged her to do, does not mean, as appellant asserts, that she was willful and free of influence.

Given a stipulation that Elizabeth Dovydenas was susceptible to undue influence and holding that the facts support a conclusion that undue influence was exerted, this Court concludes that the facts found by the bankruptcy judge sufficiently prove Elizabeth Dovydenas submitted to the overmastering effect of Stevens' influence on behalf of TBS.

## C. The First Amendment

 Appellant raises a series of objections based on the first amendment opposing Elizabeth Dovydenas' claim against TBS based on undue influence. At root, these arguments attempt to shield TBS from the consequences of Stevens' undue influence by virtue of its status as a church and Stevens' status as a clergyman. Appellant also tries to mischaracterize the case and then, based on these mischaracterizations, seeks first amendment protection. These mischaracterizations include statements that the matter is an intra-church dispute, an attempt to adjudicate the validity of a religious belief, and an attempt to stifle religious beliefs. Finally, it presents the novel argument that any words Stevens may have uttered to Dovydenas constitute "religious speech" which, appellant claims, is granted absolute protection.

The facts, as found by the bankruptcy court, show that the matter is none of these things. It is a claim by a former member of a church that she was the victim of undue influence. As such, it raises a narrow first amendment issue: were the statements found to constitute undue influence made pursuant to Stevens' religious beliefs? According to Stevens' own testimony, these statements were not reflective of Stevens' religious beliefs and thus are not protected by the first amendment.

Appellant's attempts to invoke the protection of the first amendment are, hence, based on a series of false premises. Insinuated among them is its persistent claim that it is Stevens, not Dovydenas, who is telling the truth. At one point appellant attempts to give this argument constitutional dimensions by asserting that since truth telling is a tenet of Stevens' religion, the bankruptcy court was barred from disbelieving his testimony. Appellant's claim that a minister's testimony is constitutionally protected from being disbelieved is without basis in law. In order to succeed, appellant must prove that given the facts as the bankruptcy judge found them, allowing Elizabeth Dovydenas' claim for the money she gave TBS would infringe on TBS's first amendment rights.

In determining whether or not Elizabeth Dovydenas was the victim of undue influence, this Court has relied on the findings of fact made by the bankruptcy court. Thus, to the extent that the bankruptcy court found credible Elizabeth Dovydenas'

statements that Carl Stevens told her certain things, this Court must assume he did, in fact, say them unless such a finding would be clearly erroneous. Stevens' statements to Elizabeth Dovydenas are among actions attributable to him which this Court has determined constitute undue influence. As will be discussed below, his legal responsibility for making these statements will depend on the extent to which they were motivated by his sincerely held religious beliefs. Therefore, it is important to point out that the statements Stevens made, which the bankruptcy court relied on in finding undue influence, are not religious beliefs or tenets of either Stevens or TBS, according to appellant's own admissions based on the testimony before the bankruptcy court. Trial Transcripts ("T. Tr.") 6B and 12.

By identifying statements made by Stevens, which do not express religious beliefs or tenets of TBS, this Court is not engaging in its own review of TBS's theology. Rather, it is relying on the statements of Stevens and of John Leonard, the director of the Stevens Bible College, regarding their own theology. Without repeating the analysis of undue influence set out above, this Court notes that based on Stevens' and Leonard's own testimony at the hearing—indicated by citations to the trial transcript—the following, which the bankruptcy court found were the bases of the statements which unduly influenced Elizabeth Dovydenas, are not beliefs of TBS or of Stevens:

a) Elizabeth Dovydenas had a special calling to give money to The Bible Speaks. T. Tr. 6B at 142.

b) Giving money could bring blessings and material benefits from God. T. Tr. 12 at 204.

c) Pastor Stevens was God's man. T. Tr. 6B at 131.

d) Pastor Stevens' words were the words of God. *Id.* at 133.

e) Demons influence outsiders. *Id.* at 143.

f) Outsiders should be lied to so as to confuse the devil. *Id.* at 140–141.

g) There is a duty to submit to and obey Carl Stevens. *Id.* at 134.

These principles, which Stevens expounded to Elizabeth Dovydenas and which this Court has held exerted undue influence on her, are not beliefs of TBS by appellant's own admission. 73 B.R. at 866. Therefore, actions taken or statements made espousing the above principles are not entitled to the protection of actions taken or statements made pursuant to sincerely held religious beliefs.

1. *Cantwell v. Connecticut:* Actions Taken Pursuant to Religious Beliefs

The Supreme Court in *Cantwell* held that, while religious beliefs had complete first amendment protection, conduct based on religious beliefs is subject to restriction. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), is the leading Supreme Court case regarding free exercise of religion, and presents the distinction between religious beliefs and religious conduct. In *Cantwell*, Newton Cantwell, a Jehovah's Witness, was convicted of inciting a breach of the peace by playing an anti-Catholic record on a public street corner. The Supreme Court overturned the conviction finding that playing the record was an exercise of Cantwell's religious beliefs. *Id.* at 304, 60 S.Ct. at 903–04. Therefore, the Court held, convicting him of a breach of peace would "unduly ... infringe" his protected freedom of religion. *Id.* The Supreme Court was careful to note that it was not granting blanket protection to acts or speech motivated by religious beliefs stating that "[n]othing we have said is intended even remotely to imply that, under cloak of religion, persons may, with impunity commit frauds upon the public." *Id.* at 306, 60 S.Ct. at 904. *See General Council on Finance & Administration, United Methodist Church v. California Superior Court*, 439 U.S. 1355, 1369, 99 S.Ct. 35, 36–37, 58 L.Ed.2d 63, 77 (1978) (Rehnquist, Cir. J.).

The holding of *Cantwell* is directly relevant to the facts here because the activity permitted the Jehovah's Witness, playing a record on a street in violation of local noise control laws, would be prohibited were it

not done pursuant to an individual's religious beliefs. Equally, Stevens' conduct would be prohibited as undue influence unless it was done pursuant to religious beliefs.

### 2. Court's Right to Inquire into Religious Beliefs

In granting protection to actions pursuant to religious beliefs, the Supreme Court gave courts the power to determine the existence of these beliefs. Appellant, as discussed below, misinterprets *Cantwell* as a cloak protecting it from judicial scrutiny because it claims its actions were "generally" religious and were conducted by a clergyman on behalf of his church. Appellant's claims are supported by a series of false propositions, including that churches and clergymen are immune from judicial scrutiny, and that a person need not hold the religious beliefs which result in conduct in order to be protected.

In *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1974), the Supreme Court held that a court cannot assess the truth or falsity of a religious belief. A court may, however, identify an individual's religious beliefs when that individual has invoked them. *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863–64, 13 L.Ed.2d 733 (1965) (court could determine nature, but not validity, of religious beliefs of persons seeking military exemption). In order to allow the protection afforded by *Cantwell,* however, a religious belief must be sincerely held. Unless appellant is claiming protection for speech made pursuant to Stevens' or its own sincerely held religious beliefs, its status as a church, or Stevens' status as a clergyman, cannot immunize it from the legal effect of those words as acts of undue influence. *See Van Schaick v. The Church of Scientology of California,* 535 F.Supp. 1125, 1142–43 (D.Mass.1982). Appellant cannot, therefore, avoid this Court's inquiry into whether or not Stevens' actions were pursuant to his religious beliefs.

### 3. Speech Versus Action

Appellant's final argument regarding the first amendment is a deliberate distortion of the law. It claims that since the bankruptcy court found Stevens influenced Elizabeth Dovydenas through statements he made to her, holding Stevens liable for undue influence would be an impermissible restriction of religious speech. This is because the speech took place in the context of a pastor "preach[ing] to members of his flock." Appellant's Brief at 13. However, since this Court has determined that the statements made by Stevens to Elizabeth Dovydenas which constituted undue influence were not pursuant to his religious beliefs, those statements cannot constitute "preaching" in the sense that they are protected as expressions of religious beliefs.

Underlying appellant's distortion of first amendment law is a more serious attempt to immunize Stevens from the consequences of his undue influence by offering a spurious distinction between speech and action. Although appellant argues that the "means [of exerting influence] was speech" and thus entitled to greater first amendment protection than that afforded to conduct under the first amendment, appellant's reliance upon a speech/conduct distinction in this case is misplaced. It is misplaced because as constitutional scholar Laurence Tribe explains, "[a]ll communication except perhaps that of the extrasensory variety involves conduct." Tribe, *American Constitutional Law* 599 (1978). The issue, then, of whether the appellant is entitled to protection under the first amendment does not depend upon whether Stevens' statements to Elizabeth Dovydenas constituted speech or conduct, but rather whether his statements were expressions of sincerely held religious beliefs.

As applied to Stevens, then, the extent to which he is protected by the first amendment for his speech to Elizabeth Dovydenas is one of mere academic interest because this Court has already determined that his undue influence was not motivated by his religious beliefs. Therefore, whether that influence was by word or deed, it is afforded no special protection. While the first amendment protects a wide variety of speech and actions, it is not an absolute

shield for wrongdoers from the legal consequences of their conduct. Since Stevens could not show that he exerted undue influence pursuant to his religious beliefs, he cannot claim first amendment protection for his conduct.

### 4. Not an Imposition of State Values

In holding that Stevens' actions are not protected by the first amendment, this Court is not weighing the state's rights against the debtor's. Rather, it relies on the debtor's own statement that its acts were not pursuant to its religious beliefs. Thus, this Court is not invoking the *"Reynolds"* exception to the free exercise clause. *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1878). In *Reynolds*, the Supreme Court held that even though polygamy was a sincerely held Mormon belief, a state's interest in the sanctity of marriage outweighed the Mormons' right to practice polygamy. *Reynolds*, 98 U.S. (8 Otto) at 164. The Court did not, of course, infringe upon their right to belief in polygamy. This doctrine has been applied sparingly and only in cases where health and safety are endangered. *See Goldman v. Weinberger*, 475 U.S. 503, 510, 106 S.Ct. 1310, 1314–15, 89 L.Ed.2d 478 (1986) (although wearing of a yarmulke is part of Jewish religious observance, necessity of maintaining military discipline requires that it could not be worn if violative of Air Force dress code). This doctrine is not applicable here. The issue is not that a state interest outweighs Stevens' right to commit actions stemming from his religious beliefs. The point, rather, is that Stevens was not acting pursuant to his religious beliefs when he made the statements which unduly influenced Elizabeth Dovydenas.

### 5. Clerical Immunity

█ Finally, neither churches nor clergymen are immune from judicial scrutiny. See *General Council on Finance & Administration, United Methodist Church v. California Sup. Ct.*, 439 U.S. 1369, 99 S.Ct. 35, 58 L.Ed.2d 63 (1978) (Rehnquist, Cir. J.) (Justice Rehnquist refused to grant a stay in an action against a church for breach of contract, fraud and violation of security laws); *Cantwell v. Connecticut*, 310 U.S. at 306, 60 S.Ct. at 904; *Kedroff v. St. Nicholas Cathedral for the Russian Orthodox Church in North America*, 344 U.S. 94, 120, 73 S.Ct. 143, 156–57, 97 L.Ed. 120 (1952); *Van Schaick v. the Church of Scientology of California, Inc.*, 535 F.Supp. at 1125. The Anglo–American legal system has long confronted the problem of undue influence exercised by a clergyman or spiritual advisor. In *Huguenin v. Busely*, 14 Ves.Jr. 273, 33 Eng. Reprint 526, 6 ERC 834 (1807), 14 A.L.R.2d 652 (1949), the court set aside a voluntary settlement made by a widow upon a clergyman who persuaded her to transfer the management of her affairs from her lawyers to him before making the gift. *See generally* Annot., *Undue Influence in Gift to Clergyman, Spiritual Adviser, or Church*, 14 A.L.R.2d 649 (1949).

More recently, Justice Rehnquist, acting individually, denied a church's application for a stay pending a review on certiorari. *General Council on Finance & Administration, United Methodist Church v. California Superior Court*, 439 U.S. at 1369, 99 S.Ct. at 36–37. The church was a defendant in a class action. The class was seeking damages for breach of contract, fraud and violations of state securities laws by a non-profit organization which was found to be the alter ego of the church. In rejecting the church's claim for religious immunity, Justice Rehnquist stated:

> There are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastic cognizance and policy in adjudicating intra-church disputes. But this court never has suggested that those constraints similarly apply outside the context of such intraorganization disputes. Thus, [cases regarding intra-church disputes] are not in point. Those cases are premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. Such considerations

are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged.

*Id.* at 1372–73, 99 S.Ct. at 38 (citations omitted).

This district has applied the holding of *United Methodist Church* in denying a church's claim that its actions, which the plaintiff alleged included fraud and infliction of emotional distress, could not be reviewed because they were protected by the first amendment. In *Van Schaick,* the court wrote:

> [E]ven if we were to find that the California Church is a religious institution, the free exercise clause of the First Amendment would not immunize it from all common-law causes of action alleging tortious activity. Causes of action based upon some proscribed conduct may, thus, withstand a motion to dismiss even if the alleged wrongdoer acts upon a religious belief or is organized for a religious purpose.

*Id.* at 1134 (citations omitted). This Court's right to review is even stronger here where the church was not acting upon a religious belief but merely claims protection based on its status as a religious institution.

Making first amendment arguments does not, obviously, create a first amendment issue. The Supreme Court has specifically held that status as a religious institution or clergyman does not confer immunity from tortious activity. Since this Court has determined that Stevens' statements to Elizabeth Dovydenas constituted undue influence, his only possible first amendment defense could be that his statements were made pursuant to his religious beliefs. Since appellant admits that Stevens' statements were not made pursuant to his religious beliefs, they are not protected by the first amendment. Having reviewed its findings of law de novo, this Court upholds the bankruptcy court's judgment and allows Elizabeth Dovydenas' claim against The Bible Speaks in the amount of $6,581,-356.25.

### D. Motion for Summary Judgment

■ Finally, appellant appeals the bankruptcy court's denial of its motion for summary judgment issued on February 9, 1987. Since the denial of the motion was an interlocutory order, this is the appropriate time to file an appeal.

To survive a motion for summary judgment, the non-moving party must set forth evidence from which a jury might return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Further, when considering a motion for summary judgment, this Court must view the facts and all reasonable inferences to be drawn from them in the light most favorable to the non-moving party. *Ismert & Associates, Inc. v. New England Life Insurance Company,* 801 F.2d 536, 537 (1st Cir.1986). Appellant claims in its motion that Elizabeth Dovydenas should not prevail because she has violated the tax code and filed a false claim against TBS' estate. Appellant in its briefs before this Court presents two different arguments for the granting of summary judgment. Since appellant's arguments in its first brief approach the inscrutable, this Court relies on the somewhat more lucid restatement for "clarity" in its reply brief. Appellant's Reply Brief at 15.

Briefly, appellant's arguments stem from Elizabeth Dovydenas' joint 1985 tax return. On the return, filed after she entered her petition in the current matter, she declared the $585,647 which she had given to TBS that year as a charitable contribution pursuant to 26 U.S.C. § 170. The prior year Elizabeth Dovydenas also claimed the $1,001,031 she gave to TBS as a charitable contribution pursuant to 26 U.S.C. § 170. Appellant states, correctly, that in order for a charitable contribution to be deductible from income under 26 U.S.C. § 170, the charity must be eligible to receive such gifts pursuant to 26 U.S.C. § 501(c)(3) and the donor must have no expectation of recovering her money. This Court also

agrees with appellant that 18 U.S.C. § 152 makes it a crime to file a false claim in a bankruptcy proceeding.

It is at this point that appellant's argument strays into novel territory. Appellant claims that since TBS is eligible to receive deductible donations under section 501(c)(3), Elizabeth Dovydenas' claims of those donations under section 170 constitute statements under oath that she had no expectation of recovering the money. Thus, continues the argument, Elizabeth Dovydenas should not recover the money because: 1) by categorizing the money she gave to TBS as a deduction against her taxable income, she swore she had no right to it and thus her claim against the estate is false, and/or 2) by filing a claim against the estate for recovery of the money she gave to TBS she swore she had a right to recover it and thus her income tax return is false.

Appellant also argues that Elizabeth Dovydenas should not recover because section 501(c)(3) of the tax code prevents the income of a charitable organization from inuring to a private individual. This argument is a dangerously incorrect interpretation of the tax code. There is no support for appellant's claim that section 501(c)(3) protects charitable organizations from having judgments entered against them and, therefore, this Court rejects appellant's argument.

Appellant's argument that Elizabeth Dovydenas is guilty of a felony either because of her 1985 tax return or her claim in bankruptcy would be more appropriately brought before the Internal Revenue Service or the United States Attorney rather than this Court. Viewing the facts in the light most favorable to the non-moving party, this Court notes that Elizabeth Dovydenas disclosed on her 1985 tax return the circumstances of her impending claim against TBS. Thus, she alerted law enforcement officials of her actions. There is no provision of the tax or bankruptcy code which requires this Court to disallow Elizabeth Dovydenas' claim. More importantly, the factual disputes between the parties make this case inappropriate for summary judgment. *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 803–04 (1st Cir.1987). Thus, the bankruptcy court's denial of appellant's motion for summary judgment is upheld and the motion will be denied.

## V. CONCLUSION

Having found the bankruptcy court's conclusion that debtor-appellant TBS exerted undue influence which resulted in gifts of $6,581,356.25 by the claimant-appellee is not clearly erroneous, the judgment of the bankruptcy court dated May 19, 1987 is hereby AFFIRMED. Appellant's motion for summary judgment dated February 9, 1987 is DENIED.

It is So Ordered.